## No. 9719.

### J. M. VILLAVASO ET AL. VS. LOUIS BARTHET ET ALS.

The pendency of a suit in the Circuit Court of the United States, involving the alleged unconstitutionality and illegality of a city ordinance adopted on the 12th of May, 1885, is not a bar to the right of a State court to entertain jurisdiction of a controversy involving another and a subsequent ordinance of the same Council on the same subject, passed at a date posterior to the institution of the suit in the Federal Court. Article 248 of the State Constitution of 1879 contains a delegation of a complete and exclusive power to

the city of New Orleans, to regulate the slaughtering of animals for food within its corporate limits. It embraces a delegation of the police power inherent in every sovereign government, which cannot be the subject of a contract, and which is not exhausted when once exercised on any subject falling within its scope.

In the exercise of its police power the city of New Orleans has the unquestioned right to restrict the slaughtering of animals for food to certain designated districts or localities.

It has also the right to change the designated districts for such business, if the slaughter-houses established under its previous authority should become nuisances to the surrounding neighborhood. But that discretion is not arbitrary, it must be exercised with wisdom and caution.

An unconstitutional provision in a city ordinance does not vitiate the whole ordinance, unless the two provisions are so closely connected in object and meaning, that the one cannot exist without the other. When a municipal corporation passes an ordinance, legislative in its character, importing no private contract or rights, the members of the corporation enjoy the same prerogatives as members of a State Legislature, and their conduct or motives in passing the ordinance cannot be questioned.

APPEAL from the Civil District Court for the Parish of Orleans. *Tissot,* J.

### *White & Saunders* for Plaintiffs and Appellees:

1. The ordinance of September, 1885, changing the limits within which slaughter-houses could be lawfully carried on, was a lawful exercise of municipal authority. Cons. 248.

2. The slaughter-house of defendant, being outside of the legal limits, became unlawful, hence a public nuisance, as well as a private nuisance, to those in proximity to whose residences it was established.

3. As a public and private nuisance, the residents of the vicinage were authorized to invoke its suppression by judicial process. Blanc vs. Murray, 36 Ann. 162.

4. The ordinance of September, 1885, being a police regulation, the defendant cannot refuse to obey its provisions, under the pretense of vested right. If lawful, when established, his business was subject to the future exercise of the police power. 33 Ann. 934; Butchers' Union vs. Crescent City Co., 111 U. S. 746.

5. The Court will not substitute its discretion for that of the city, when the city exercises police power delegate to it alone.

6. But if the Court could do so, the facts justify the ordinance, and show its wisdom.

7. The limits designated by the Ordinance of September, 1885, impliedly are those sanctioned by the Constitution. 33 Ann. 934.

8. Where a municipality exercises a general legislative and police authority, courts will not inquire into the motives of the legislators, in order to avoid the legislation. Dillon, vol. 1, No. 313, p. 326, 3d ed.; Jones vs. Loving, 55 Miss. 109; Paine vs. Boston, 124 Mass. 486; 59 Penn. 257; Indiana, 458; 3 Denio, 20; 44 Mo. 491.

9. No tender of proof, as to corruption of the city government, was made.

10. If made and rejected, the ruling was correct, as the evidence was inadmissible. Cooley Const. Limit. 135, 136, 186, 208.

### *B. R. Forman* and *E. H. McCaleb* for Defendants and Appellants:

1. While the power is delegated to the municipal authorities to designate the area within which slaughter-houses can be carried on, in the exercise of that power they are prohibited from creating or perpetuating a monopoly, directly or indirectly, or restricting the business of slaughtering animals for food to the lands or houses of any individual or corporation. Arts. 248 and 258 Constitution.

2. When the City Council in designating an area in which many competitive slaughter-

Villavaso et al. vs. Barthet et als.

houses might be carried on, required permanent and expensive structures to be made ' such as steam pumps, an abundant supply of cold and warm water, and large closed discharge pipes leading into the river below low watermark, etc., as it did in 1881; and when on the faith of that ordinance defendant has put up such structures, at an expense exceeding $10.000, and established a business, the City Council cannot arbitrarily and summarily close him up and banish him to an inaccessible point. Such action would deprive the defendant of a vested right, and deprive him of his property without duprocess of law, and without previous compensation paid to him; in violation of the Cone stitution of Louisiana, Arts. 155 and 156, and Art. 6, and in violation of the 5th and 14th amendments to the Constitution of the United States.

3. The ordinance of September, 1885, is null and void for the foregoing reasons, and because it designates no place where slaughterhouses may be carried on, and its effect is to perpetuate a monopoly and to restrict the business to the lands or houses of a particular corporation, and it delegates to the majority of the neighbors the decision of questions which must be determined by the Council itself within its power.

4. An area having been designated for slaughterhouses in 1881, which, after much litigation, has been maintained in the courts—contradictorily with a citizen in the same neighborhood—and during the multifarious litigation which followed the plaintiffs kept silent, they are estopped in equity from complaining, and seeking to make defendant tear down his expensive structures.

5. Unless the evidence shows that Barthet's slaughterhouse was in fact a nuisance plaintiffs have no right to complain.

6. That which is legal cannot be a nuisance to be suppressed by injunction. Howell vs. Butchers' Union, 36 Ann. 63; Sicard vs. Chitz, 13 L. 111; New Orleans vs. Warden, 11 Ann. 244; Leigh vs. Westervelt, 2 Duer, 618; Remmick vs. Morris, 7 Hill, 575; Lewis vs. Behan, 28 Ann. 130; C. C. 569 Digest Lib. 8, sec. 5; Domat, Part 1, Book I, Art. XII, sec. 2, No. 1048.

7. The Federal Court having first acquired jurisdiction over the cause was entitled to hold it to the exclusion of the State court. New Orleans vs. Steamship, 20 Wall. 393; Memphis vs. Dean, 8 Wall, 64; Taylor vs. Taintor, 16 Wall. 470; Peck vs. Jannes, 7 How. 625; Butchers' Union Co. vs. Crescent City Slaughterhouse Co., 37 Ann. 874.

8. The proceedings and decree of the Federal Court are binding upon all the inhabitants of the city represented by the corporate authorities. Freeman on Judgments, sec. 178; Parker vs. Scoggin, 11 Ann. 629; Xiques vs. Bujac, 7 Ann. 499; Shields vs. Chase, 32 Ann. 410.

9. Evidence should have been admitted to prove that the city ordinance of 1885 was procured by the Crescent City Slaughterhouse Company by corruption of the Council, and that this suit was instituted and maintained by them. State ex rel. vs. Cincinnati Gas Co., 18 Ohio, 300; Miners' Bank vs. U. S., 1 Green, 553; Davis vs. Mayor, 1 Duer, 451.

---

The opinion of the Court was delivered by

Poché, J. The main object of this suit is to restrain the defendants from carrying on the business of slaughtering animals for food in the immediate vicinity of plaintiffs' residences, in the lower part of the city of New Orleans, in the square bounded by Peters, Flood, Delaronde streets and Caffin avenue. After alleging that the business complained of is in itself a nuisance, and that its close proximity to their residences renders it unbearable to them, plaintiffs charge that defendants' slaughter-house is at the same time a public nuisance, because it

is carried on in violation of a city ordinance which restricts the business of slaughtering animals for food to another portion of the city.

The grounds of resistance relied on by defendants are substantially as follows:

1st. That the State courts are bereft of jurisdiction in the premises by reason of the pendency of a suit, in the Circuit Court of the United States, between Barthet, one of the defendants herein, as plaintiff, and the city of New Orleans as defendant, in which an injunction had been issued, before the institution of this suit, *pendente lite*, restraining the city from interfering with Barthet's right of carrying on the business of slaughtering animals for food at the point described in plaintiffs' petition.

2d. That the city ordinance of September 12, 1885, which forbids the maintenance of slaughter-houses in the portion of the city described in plaintiffs' petition, is unconstitutional, illegal, unreasonable and oppressive.

The judgment of the district court perpetuated the preliminary injunction issued in favor of plaintiffs, and ignored their demand for damages. Defendants appeal, and plaintiffs have presented no motion for an amendment of the decree, hence the question of damages heretofore incurred by plaintiffs is eliminated from discussion in the present appeal.

I.

The plea to the jurisdiction was urged under the following circumstances:

During the progress of the trial, plaintiffs, in rebuttal, offered in evidence the record of the suit of Barthet vs. City of New Orleans, then pending in the Circuit Court of the United States. The object of the evidence was to contradict Barthet's testimony in this case, as conflicting with his affidavit in the other suit.

At that stage of the proceedings defendants in this case tendered the issue, as a peremptory exception, that the State court was without jurisdiction to hear and determine the issues involved in this controversy, which were the same as presented in the suit pending before the Federal court.

An inspection of the record in that case, and of the opinion and decree rendered therein, shows that the issue in that controversy turned upon the alleged unconstitutionality of a city ordinance adopted on the 12th of May, 1885, the purport of which was to subject the right of maintaining slaughter-houses in the district herein above described, to the express permission of the council in each case.

Villavaso et al. vs. Barthet et als.

The court held the ordinance to be unconstitutional, and issued a preliminary injunction restraining the city council from the performance of the threatened unlawful act complained of by Barthet.

That suit was instituted on June 22, 1885, and the decree was rendered in July following. Now the ordinance which is the groundwork of plaintiffs' complaint in the case before us, was adopted on the 12th of September following; and its purport is to restrict the slaughtering of animals for food to the fifth district of the city of New Orleans, situated on the right bank of the Mississippi river, to that district below the depot of the Morgan's Louisiana and Texas Railroad Company, and extending to the lower limit of the parish of Orleans.

It is therefore very clear that an issue arising under an ordinance adopted on the 12th of September, 1885, could not have been presented, and that it could not have been judicially contemplated in a decree rendered, in a suit which had begun on the 22d of June previous.

The objection to the jurisdiction of the court *a qua* which was neither a plea of *lis pendens* nor of *res adjudicata,* was properly overruled.

II.

The unconstitutional, illegal and oppressive features of the ordinance of September 12, 1885, are contained in several subdivisions:

1st. It is charged that the ordinance is void because it involves an illegal exercise of power on the part of the city, whose authority to designate places for slaughtering was exhausted by the ordinances of October and November, 1881, after which the city was stripped of the power to make any changes, as such changes would impair the rights of parties who had established slaughter-houses under the effect of the ordinances aforesaid.

Under the ordinances referred to, the city had designated a district which includes the spot on which the defendants have erected their slaughter-house, as the limits within which the business of slaughtering animals for food could be carried on, under the authority of the city.

The main object of the ordinance of September, 1885, is to operate a change in the limits established by the two previous ordinances of 1881. It reads as follows:

" It shall be unlawful to establish slaughter-houses in the parish of Orleans, except in the fifth district thereof, below the depot of the Morgan's Louisiana and Texas Railroad Company; and before the erection of any such slaughter-house, the particular location selected shall be approved by an ordinance of the city council, on a petition of a majority of the neighborhood. The operations in and about all

slaughter-houses in the city of New Orleans, shall be in accordance with the provisions of Ordinance No. 7336, Administration Series, adopted September 13, 1881.

"Art. 2.  That all that portion of Ordinance 7376, A. S., adopted 13th of October, 1881, and Ordinance No. 7437, A. S., adopted November 18, 1881, designating the territory between Poland or Reynes street, the Mississippi river, Good Children street and the lower limits of the parish of Orleans, where slaughter-houses could be kept and maintained, be and the same is hereby repealed."

If the ordinance is legal and binding in its effect, it is clear that the authority granted by the ordinances which it purports to repeal is recalled, and that the slaughter-house erected by defendants is undoubtedly prohibited.

The power of the city council to regulate the business of slaughtering animals for food, within the city limits, is derived directly from the Constitution of the State.   Article 248 reads:

" The police juries of the several parishes, and the constituted authorities of all incorporated municipalities of the State, shall alone have the power of regulating the slaughtering of cattle and other live stock within their respective limits; *provided,* no monopoly or exclusive privilege shall exist in this State, nor such business be restricted to the land or houses of any individual or corporation; *provided,* the ordinance designating the place for slaughtering shall obtain the concurrent approval of the board of health or other sanitary organization."

From the language of the article it appears that the framers of the Constitution intended to vest in the enumerated subdivisions of the State, within their respective limits, the whole power inherent to a sovereign touching the regulation of the slaughtering of animals for food.

The power thus delegated is as complete, unrestrained and unshackled as it originally existed in the State itself, and its exercise can be circumscribed by no limits or conditions which could not apply to the State or to the sovereign whence it emanates.

Its description in American jurisprudence is the police power, a governmental attribute which cannot be the subject of a contract, and to the free exercise of which no estoppel can be interposed.

It is therefore error to assert that in its exercise for the regulation of any subject, it can be considered as exhausted —and that it can never undo what it has once done.

In the sovereign, its existence is coeval with the government; in a subordinate State functionary, it lasts as long as the delegation thereof continues.

But its nature and scope, as well as its existence, are subjects long since removed beyond the domain of discussion; they have been well defined and safely consecrated in a long series of adjudications rendered by the Supreme Court of the United States, by our own Supreme Court and by those of many of our sister States.

In the case of the Butchers' Union Company vs. Crescent City Company, 111 United States Reports, p. 746, in which the right of the State of Louisiana, under its police power, to abrogate certain franchises previously granted by the Legislature, was contested by the defendant corporation, the Court, in treating of this identical subject, used the following language:

"The denial of this power, in the present instance, rests upon the ground that the power of the Legislature intended to be suspended is one so indispensable to the public welfare that it cannot be bargained away by contract. It is that well-known but undefined power called the police power. We have not found a better definition of it for our present purpose than the extract from Kent's Commentaries in the earlier part of this opinion. 'The power to regulate unwholesome trades, slaughter-houses, operations offensive to the senses,' there mentioned, points unmistakably to the powers exercised by the Act of 1869, and the ordinances of the city under the Constitution of 1879. While we are not prepared to say that the Legislature can make valid contracts on no subject embraced in the largest definition of the police power, we think that in regard to two subjects so embraced, it cannot, by any contract, limit the exercise of those powers to the prejudice of the general welfare. These are the *public health* and *public morals*. The preservation of these is so necessary to the best interests of social organization that a wise policy forbids the legislative body to divest itself of the power to enact laws for the preservation of health and the repression of crime."

Similar views were expressed by this Court in the case of the Crescent City Slaughter-house Company vs. City of New Orleans, 33 Ann. 934.

In the case of Stone vs. Mississippi, 101 United States Reports, p. 814, that exalted tribunal said very emphatically, on this subject: "No Legislature can bargain away the public health or the public morals. The people themselves cannot do it, much less their servants. The suspervision of both these subjects of governmental power is continuing in its nature, and they are to be dealt with as the special exigencies of the moment may require. Government is organized with a view to their preservation, and cannot divest itself of the power to provide

for them.   For this purpose the legislative discretion is allowed and the discretion cannot be parted with any more than the power itself." Fertilizing Co. vs. Hyde Park, 97 U. S. 659.

It will thus be seen that in the contest of the defendants' predecessors, whose triumph resulted from the consecration of the principle that the police power is a continuing governmental attribute, they succeeded to open a door which cannot now be closed by virtue of the same doctrine.

2d.   Defendants' next contention is that the ordinance is without effect as to them because their right to carry on a slaughterhouse at the point designated has been judicially recognized in the two decisions hereinabove referred to.   33 Ann. 934, and 111 U. S. 746.

That argument is practically answered by the considerations advanced by us on the first point of contention.

3d.   It is also urged that the ordinance is unjust and arbitrary; that the limits designated by it are not adapted to the establishment of slaughterhouses, and that the designation of the limits fosters a monopoly, in violation of the Constitution.

As already demonstrated in this opinion, the city is clothed with the exclusive and constitutional mandate, to regulate, within its corporate limits, the slaughtering of animals for food.   Under such a delegation of power the question might arise as to the authority of the judiciary to interfere with the legislative discretion thereby vested in the municipal authorities, for the purpose of checking an unwarranted or arbitrary exercise of the same.   .

But granting the power of courts to encompass municipal action on the subject within proper limits, the evidence in the record in this case is amply sufficient to refute the charge of unjust, arbitrary or oppressive action on the part of the City Council in the change sought to be made by means of the ordinance of September 12, 1885.

On many points of our inquiry the testimony is conflicting, but the preponderance of the voluminous evidence in the record establishes on this point the following state of facts:

Defendants established their slaughterhouse on the main street or principal thoroughfare of the neighborhood, situated in the district designated in the ordinances of September, October and November, 1881, a street which runs along the banks of the Mississippi River, and on which stand the family residences of plaintiffs and other persons living in that portion of the city.

The slaughterhouse was built in very close proximity to the residences of plaintiffs, who had selected that site for their homes, on ac-

count of the advantages of river breezes and ample supply of pure air, coupled with the orderly and quiet condition of the neighborhood.

A short distance below, also on the banks of the river, stand the United States Barracks, in which a garrison of troops, with the necessary complement of officers of the regular army is constantly quartered ; and for which the main supply of water is taken from the river by means of a pump and pipe worked by steam power.

In the month of April, 1885, while the slaughterhouse was in progress of erection, the resident neighbors, several of whom are plaintiffs herein, presented a written protest to the City Council, against the establishment and maintenance of a slaughterhouse in that locality and in which they detailed the several nuisances to which they and their families would be subjected by the proposed enterprise.

Their complaint was not then heeded, and the slaughterhouse began its operations on the 11th of July, 1885.

Practical experience soon demonstrated to the Council that a slaughterhouse is *prima facie* a nuisance to those who live in close proximity thereto.

Besides the usual adjuncts of such an establishment, such as the agglomeration of a class of men not desirable as neighbors, the driving of wild steers in the street to the terror and great danger of persons passing to and fro on the street, the loud and yelling voices of cowboys, the noxious smell of blood and of offal of slaughtered animals, came the polution of the water in the river through the action of the waste or discharge pipe used by the slaughterhouse for the discharge of blood and other refuse matter incident to such operations.

The complaints of the neighbors were thus reiterated, and became louder and more clamorous, as they were joined by the officer in command of the Barracks, who complained to the Council that the water which was pumped from the river for the use of the garrison was polluted through the operations of the slaughter-house.

A chemical analysis by an expert and competent chemist of several samples of water taken at the place where the discharge pipe empties its contents in the river, at longer distances below and immediately at the point where the suction pipe of the pump used at the barracks connects with the river, corroborated the charge made by the commanding officer of the barracks.

All these complaints, as well as the report of the chemist who had been selected by the counsel of the defendants, were referred to the proper committee of the Council, who gave a hearing to all parties concerned, and took the advice of the Sanitary Inspector of the Board of

Health as to the nuisance condition of the business complained of. The committee on health then submitted their report to the Council; it consisted in recommending the ordinance which was adopted by the Council on September 12, 1885.

In addition to all these elements of complaint going far to show that the defendants' business was a public as well as a private nuisance, the council had also to consider the fact that the defendants had omitted to comply with a very important sanitary condition exacted by the terms of the very ordinance under the authority of which they were operating their establishment. That condition was the use of a nuisance boat "amply sufficient to hold and contain and carry off daily all offal, filth and waste" of their slaughter-house.

To dispose of such matter, the defendants hauled the same in carts, running in front of plaintiffs' residences, to a nuisance wharf belonging to the city, situated a short distance above the slaughter-house.

Under this condition of things, the members of the city council deemed it their right, and conceived it their duty, to suppress the defendants' business at the point selected by them.

With such a showing, this Court cannot and will not undertake to say that the action of the council was either unjust, unwise, arbitrary or oppressive.

It is well settled in jurisprudence, from lessons taught by nature itself, that "Slaughter-houses are regarded as *prima facie* nuisances, and their existence so near to dwellings as to impair their comfortable enjoyment is an actionable injury, and their presence in a public place or near a highway, whereby the public is annoyed, although only for a temporary period, is a public nuisance." Woods on Nuisances, p. 657.

" The business of slaughtering cattle has been held to be a nuisance where no noxious smells were liberated therefrom, when carried on near a highway so that the smell of blood frightened horses passing it. * * * Also when the business was carried on upon the banks of a stream, and the blood from the animals was discharged into the stream so as to pollute the waters thereof. Nor will the fact that the waters of the stream are already partially polluted, justify, or in any measure serve as a defense to an action for an increase of the nuisance, by the discharge of the blood and offal from a slaughter-house into the stream or by any other method." Woods on Nuisances, p. 664; Howell vs. Butchers' Union, etc., 36 Ann. 63.

With a view to subject these lessons of experience to a practical test in the incorporated cities of the State, but principally in the city of

Villavaso et al· vs. Barthet·et als.

New Orleans, the framers of our Constitution delegated the power, full and exclusive, to the constituted authorities of all incorporated municipalities to regulate the slaughtering of animals for food within their limits.

Now, in the exercise of that power, the city council ordained in September, 1885, that it shall be unlawful to establish slaughter-houses in the parish of Orleans, except in the fifth district thereof, below the Morgan Railroad depot. We fail to perceive in that action any design or intent to foster a monopoly for the slaughtering of animals in the State.

From the record it appears that in the designated limits there is ample room to establish several slaughter-houses. True, the locality is not as convenient to that particular business as the limits prescribed in the ordinances of 1881, but this is a matter which must be left to municipal discretion, in the exercise of the police power. As a consideration, it must be held to be secondary to that of the public health and public comfort.

It may be, as contended by appellants, that the change will operate favorably to the benefit of the Crescent City Slaughter-house Company, whose establishment is situated on this side of the river, immediately below the lower limits of the city of New Orleans, in the parish of St. Bernard—and that the location of that slaughter-house is equally noxious and injurious to residents in its vicinity. But the city of New Orleans has no control over that establishment, and these considerations can have no weight on the judicial investigation which now concerns us. Chances and advantages or disadvantages in trade or business cannot be regulated by judgments of courts.

4th. Defendants further charge the unconstitutionality and nullity of the ordinance of September 12, 1885, because it exacts the consent of the city council and of the majority of the neighbors, as a condition precedent to the erection of a slaughter-house in the designated limits.

This question does not properly arise in the present controversy. It could require judicial solution only in a case arising between a party who would desire to establish a slaughter-house in that locality, without complying with the imposed conditions, and the municipal authorities or any person or persons who would seek to interfere with him or his enterprise.

The question before us is not the wisdom of the selection, but the right to enforce the prohibition contained in the ordinance.

Conceding for the sake of argument that the condition imposed is unconstitutional or, as alleged, impossible of execution, it cannot invalidate or vitiate the whole ordinance.

17

Without it the prohibition to slaughter animals in the parish of Orleans, except in the designated district, is complete for two purposes, namely: the prohibition on the one hand, and the permission on the other. The legal object and the void provision are not so connected together in meaning and intent that the one could not legally exist without the other.

"Where, therefore, a part of a statute is unconstitutional, that fact does not authorize the courts to declare the remainder void also, unless all the provisions are connected in subject-matter, depending on each other, operating together for the same purpose, or otherwise so connected in meaning that it cannot be presumed the Legislature would have passed the one without the other. The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand though the last fall." Cooley's Constitutional Limitations, 4 ed. p. 215·

This concludes our review of all the points made by defendants' counsel, and ably supported both in oral argument and by brief.

But we must now direct our attention to bills of exception which they took from two rulings of the district judge, who rejected testimony proffered by defendants for the purpose of showing that the ordinance of September 12, 1885, was fostered, and that the present litigation was instigated by the Crescent City Slaughter-house Company, in order to retain its monopoly in the slaughtering of animals for food in the markets of New Orleans, in defiance of the Constitution.

The investigation undertaken by the defendants involved the right, which they claim, of questioning the intent and the motive of the council in passing the ordinance by which they have been injured.

The ordinance is clearly general and legislative in its character and scope; it does not purport to enter into a special contract with, or to confer any franchise upon, any individual or body, or combination of individuals. Hence, in this connection the members of the city council are entitled to the same privileges and prerogatives which belong to members of a State Legislature.

"If a court of law can, in any case, inquire into the motives of members of the Legislature, it cannot do so collaterally." *   *   6 Cranch, p. 87, Fletcher vs. Peck.

From numerous respectable judicial authorities, Judge Dillon, in his work on corporations, has formulated the following principle:

"When the officers of municipal corporations are invested with legislative powers, they are exempt from individual liability for the

passage of an ordinance within that authority, and their motives in reference thereto will not be inquired into." Dillon, 3 ed. p. 326.

The passage of the ordinance now under discussion involved the exercise of the highest legislative power which could possibly be delegated to a municipal corporation under a republican form of government, namely: the police power.

The evidence was properly rejected.

If the defendants can prove against any member or members of the city council the charges which are intimated in their brief, their remedy is clear under constitutional provisions and existing laws.

But the issue as submitted to us in the pleadings is restricted to a question of usurpation of power, and of arbitrary and oppressive conduct, on the part of the council as a body.

Under that issue, important in itself, but restricted by the pleadings, the Court has no authority to investigate or ascertain what assistance, if any, plaintiffs herein have received from the Crescent City Company or other outside parties or influences. Our only concern is to ascertain, under the law and the evidence, whether they are entitled to the relief which they seek from the courts of their country.

The district judge has reached conclusions favorable to their demand, which he supports in an able, vigorous and well considered opinion; from which we have reaped material assistance, and we concur with him.

Judgment affirmed.