IN RE APPLICATIONS OF MINNEAPOLIS AND ST. PAUL
STREET RAILWAY COMPANIES TO FIX RATES OF FARE.
CITY OF MINNEAPOLIS v. MINNEAPOLIS STREET
RAILWAY COMPANY.
ST. PAUL CITY RAILWAY COMPANY v. CITY OF ST. PAUL.[1]

May 13, 1949.

Nos. 34,879, 34,888.

---

[1]Reported in 37 N. W. (2d) 533.

*Bruce J. Broady,* Corporation Counsel, and *Marshall F. Hurley,* Assistant Corporation Counsel, for appellant City of St. Paul.

*John F. Bonner,* City Attorney, and *Oppenheimer, Hodgson, Brown, Baer & Wolff,* for appellant City of Minneapolis.

*James E. Dorsey, Pierce Butler, Edgar G. Vaughan, Dorsey, Colman, Barker, Scott & Barber,* and *Doherty, Rumble, Butler & Mitchell,* for respondent street railway companies.

PETERSON, JUSTICE.

These appeals are from orders denying motions of the city-appellants to vacate orders of the railroad and warehouse commission fixing emergency or temporary rates of fare to be charged by the street railway company-respondents and to stay the rate orders pending these appeals.

Four questions are presented for decision, viz.:

(1) Whether an exercise by the commission of its power under M. S. A. 220.13 to find the value of a street railway property and to fix a rate of fare based thereon exhausts its power to fix emergency or temporary rates of fare pending a rate-making proceeding;

(2) Whether in fixing an emergency or temporary street railway rate of fare the commission has the power to fix it in such an amount as will produce revenue not only necessary to meet fixed charges and operating expenses, but also sufficient to yield a reasonable return on the fair value of the property devoted to street railway use;

(3) Whether a finding by the commission of the emergency on which the emergency or temporary fare is based is necessary; and

(4) Whether a prior order of the commission, made within a year prior to the emergency or temporary rate order, fixing rates of fare and providing that "after the expiration of one year" an application to modify it might be made, barred such an application within the year.

There may be other questions lurking in the record, but, since they have not been assigned as error, we neither decide them nor intimate any opinion with respect to them.

The facts out of which these questions arise are that both street-car companies, having filed declarations and consents and obtained indeterminate permits under §§ 220.01 to 220.19 (L. 1921, c. 278), commonly known as the Brooks-Coleman Act, are subject to control and regulation by the commission with respect to rates of fare. The statute is a comprehensive one. So far as here material, the statute provides that the commission is granted "initial and exclusive power" to fix rates of fare to be charged by street railways for carrying passengers (§ 220.10) ; that "at any time" a city or street railway company may apply to the commission to fix rates of fare (§ 220.13), which are required to be based on the fair value of the street railway property and to yield to the street railway a reasonable return on the fair value of its street railway property within such city as an operating system (§§ 220.10, 220.11, 220.13, 220.14, and 220.15) ; that upon application the commission may establish "an emergency or temporary rate pending a valuation of property and the establishment of a rate based thereon," provided that no emergency or temporary rate shall continue in force or effect longer than is necessary to make such valuation and to establish a rate based thereon (§ 220.13) ; and that notice of hearing of all applications to fix rates shall be given to the city or company affected thereby (§§ 220.10, 220.13, and 220.14), with right of appeal to the district court from any order of the commission (§§ 220.10 and 220.15).

In 1925, in rate proceedings, the commission found the values of the street railway properties here involved and fixed a rate of fare

based thereon, and thereafter, in 1929, 1941, 1943, and 1947, it reopened the proceedings for the purpose of making adjustments in the valuations and of fixing new rates of fare based thereon. While there have been several hearings and orders, all have been part of a single proceeding, the one instituted in 1925, which has been reopened from time to time to hear and determine such further applications to fix rates of fare as have been instituted.

Each of the 1947 rate orders contained a provision to the effect that the rate of fare should be ten cents cash fare or five tokens for 45 cents (each token to be a fare), with transfer privileges then in force, and that after the expiration of one year from the date of the order (September 10, 1947) either the city or the street railway company might apply to the commission for a modification of the order. The present applications were filed in May 1948 (within, not after the expiration of, one year from the date of the September 10, 1947, order) and petitioned the commission to reopen the prior proceedings, to fix the rate of fare at 12 cents, and to fix an emergency or temporary fare pending the final determination of the applications.

The fixing of an emergency or temporary rate of fare pursuant to the applications was heard as a separate matter in June 1948. On July 12, 1948, the commission filed orders fixing the rate of fare in each city at 11 cents, with existing transfer privileges, until changed by subsequent order of the commission, and adjourning the hearing to a later date to be fixed on application and ten days' notice.

The July 12, 1948, order in the Minneapolis case found as facts that by the 1947 order the rate of fare was increased so as to increase the company's annual net operating revenue to $1,183,583, which it was estimated would yield a return of 5.99 percent on the fair value of its property; that subsequent thereto operating expenses had increased by reason of wage increases retroactive to January 1, 1948, provision for sick leave of employes made necessary under an employment contract, added services, and higher taxes so as to reduce the net operating income to $175,674 during

the first five months of 1948 or an "equated rate of return" of 2.13 percent on the valuation found by the 1947 order; that to make the net operating income yield a fair return (5.99 percent) on the 1947 valuation, which was adopted for purposes of the 1948 order, the rate of fare should be increased to 11 cents; and as a conclusion that the rate of fare should be increased to 11 cents until changed by subsequent order of the commission and that the hearing be adjourned to a later date to be fixed upon application and notice.

The July 12, 1948, order in the St. Paul case found as facts that the valuation made in the 1947 order had been adopted by both parties; that by the 1947 order an increase of fares was granted increasing the company's annual operating revenues $707,134; that expenses had increased subsequent to such order in the amount of $727,213 because of increased wages, benefits to employes, and added services, thus reducing the company's income $20,779 below what it was at the time of the 1947 increase; and that an increase of the rate of fare should be made sufficient to earn a reasonable return (6.62 percent) on the fair value of its property; and as a conclusion that the rate of fare should be increased to 11 cents, etc., as in the Minneapolis case.

It appears without dispute that the increases ordered were more than was necessary to meet fixed charges and operating expenses of the street railway companies, but not more than was necessary to yield a reasonable return on the fair value of their properties comprising their street railway systems.

█ The argument in support of the cities' contention that the commission's power to fix emergency or temporary rates of fare has been exhausted is that the act contemplated that, when street railway companies came under the act, it would be necessary in the first rate-making proceeding for the commission to establish a valuation of their properties; that, because rate-making proceedings may consume long periods of time, the commission was authorized to fix emergency or temporary rates of fare pending a valuation of the street railway properties; that the power so granted was limited to the making of the first valuation—a valuation; and that the

exercise of the power to make the valuation in 1925 exhausted the power thereafter to fix emergency or temporary rates of fare.

Whether the power to fix emergency or temporary rates of fare was one which was to be exhausted by a single exercise of the power to make *a* valuation or was one to be exercised repeatedly as occasion might require depends on the legislative intent. This is to be sought in the language used, in the light of the subject matter and the purposes of the statute. All the indicia of legislative intention here betoken a meaning that the power to fix emergency or temporary rates of fare was to be a continuing one to be exercised repeatedly as occasion might require. To begin with, there is no express provision in the act that a single exercise of the power to make a valuation shall exhaust the power to fix such rates of fare pending a valuation. Because express manifestation of such an intention is lacking, the existence thereof depends upon whether an inference thereof is permissible. If such an inference is not permissible, it follows that such an intention is entirely absent. The question, then, is what inferences are to be drawn from the provisions of the act. First to be considered is the nature of the power. Fixing rates is a legislative function (City of Duluth v. R. R. & W. H. Comm. 167 Minn. 311, 209 N. W. 10) involving an exercise of the police power, which is of a continuing nature (Dobbins v. City of Los Angeles, 195 U. S. 223, 25 S. Ct. 18, 49 L. ed. 169; Villavaso v. Barthet, 39 La. Ann. 247, 1 So. 599; 16 C. J. S., Constitutional Law, § 175), and which is not exhausted by a single exercise thereof (Union Oil Co. v. City of Portland [D. C.] 198 F. 441); but may be exercised repeatedly as often as occasion may require (Town of East Hartford v. Hartford Bridge Co. 51 U. S. 511 (How.) 13 L. ed. 518; 11 Am. Jur., Constitutional Law, § 254). In State Public Utilities Comm. ex rel. Quincy Ry. Co. v. City of Quincy, 290 Ill. 360, 365, 125 N. E. 374, 376, it was held that the power to fix public utility rates is a continuing one, which may be exercised "again and again, as often as the public interests require." The provision of § 220.13 to the effect that an application to fix rates of fare may be filed "at any time" and that of § 220.14

to the effect that there may be in any rate proceeding a valuation of the properties of the street railway involved evince an intention that the power to fix rates based on valuation of the property is to be exercised from time to time as occasion may require. A power to be exercised *at any time* is one to be exercised from time to time in the discretion of the grantee thereof. State Street Trust Co. v. Crocker, 306 Mass. 257, 28 N. E. (2d) 5, 128 A. L. R. 1166. Next to be considered are the requirements conditioning the exercise of the power to fix emergency or temporary rates of fare. These are to be found in the numerous provisions of the statute mentioned above, to the effect that rates of fare fixed shall be such as to yield a reasonable return on the fair value of the street railway property, and in well-settled rules of constitutional law that rates must be sufficient to yield a reasonable return on the fair value of the utility's property *at the time* it is being used to serve the public (State v. Tri-State T. & T. Co. 204 Minn. 516, 284 N. W. 294; American Toll Bridge Co. v. Railroad Comm. 307 U. S. 486, 59 S. Ct. 948, 83 L. ed. 1414; Smith v. Illinois Bell Tel. Co. 282 U. S. 133, 51 S. Ct. 65, 75 L. ed. 255; 43 Am. Jur., Public Utilities and Services, §§ 102, 115, 126), and that not only permanent rates, but also temporary rates during the rate-making process, must yield such a reasonable return (State v. St. Paul City Ry. Co. 196 Minn. 456, 265 N. W. 434; N. W. Bell Tel. Co. v. Hilton [D. C.] 274 F. 384). It follows necessarily that there may be both occasion and necessity to establish emergency or temporary rates pending the rate-making process. See, N. W. Bell Tel. Co. v. Hilton, *supra.*

The provisions of the statute for repetitious exercise of the rate-making process with the making of *a* valuation as an incident of each exercise thereof to obtain a base for the determination of the reasonableness of the rates to be fixed and for the fixing of rates sufficient to yield a reasonable return on such valuation evince, in the light of constitutional requirements that emergency or temporary rates the same as permanent rates must yield such a return, an intention that the power to make valuations and to fix emergency or temporary rates pending the making of such valuations is of a

442

continuing nature, to be exercised repeatedly as occasion may require. Such a meaning is implicit in the very nature of the power and of the statutory and constitutional requirements governing its exercise.

There are, of course, powers which are exhausted by a single exercise thereof (see State ex rel. Clark v. Stanley, 66 N. C. 59, 8 Am. R. 488), but the commission's power to fix emergency or temporary rates of fare is not of that kind.

■ In fixing an emergency or temporary street railway rate of fare, the commission has the power to fix it in such an amount as will produce revenue not only necessary to meet fixed charges and operating expenses, but also sufficient to yield a reasonable return on the fair value of the property devoted to street railway use. As a matter of law, a rate of fare in such an amount is required because a lesser one would be confiscatory and violative of due process. State v. St. Paul City Ry. Co. 196 Minn. 456, 265 N. W. 434. This rule is a well-established one, applicable generally to fixing rates of public utilities. State v. Tri-State T. & T. Co. 204 Minn. 516, 284 N. W. 294, and N. W. Bell Tel. Co. v. Hilton (D. C.) 274 F. 384, *supra.* It follows that the contention that an emergency or temporary rate increase must not be more than sufficient to meet fixed charges and operating expenses must be rejected. Several authorities[2] have been cited in support of the view that the amount of such increases should be so limited. Others[3] might be cited which discuss phases of the question before us. It would serve no useful purpose to review them. None of them involve the constitutional question whether increases so limited are confiscatory and hence a violation of due process, as do the St. Paul City Ry. Co. and N. W. Bell Tel.

[2]Omaha & C. B. St. Ry. Co. v. Nebraska State Ry. Comm. 103 Neb. 695, 173 N. W. 690; City of Columbus v. Public Utilities Comm. 103 Ohio St. 79, 133 N. E. 800 (concurring opinion of Mr. Chief Justice Marshall); Re Lincoln Traction Co. P. U. R. 1918 D 168; Re Tri-State T. & T. Co. P. U. R. 1919 C 5; Re Nashville Ry. & L. Co. P. U. R. 1920 C 1.

[3]Sprague v. Biggs, 390 Ill. 537, 62 N. E. (2d) 420; New England T. & T. Co. v. State, 95 N. H. 258, 57 A. (2d) 267; *Id.* 93 N. H. 353, 64 A. (2d) 9.

Co. cases, *supra*, which announce the rule controlling here, and, because that is true, the authorities cited are not in point.

■ The question as to whether the commission is required to find the facts upon which it bases an order fixing emergency or temporary rates of fare is answered by the fact that here the commission actually made detailed and explicit findings of fact upon which it based its order. The requirements of the rule contended for were in fact satisfied here.

■ The commission had the power, notwithstanding its order of September 10, 1947, to the effect that an application might be made to modify it "after the expiration of one year," to entertain the instant proceedings *within* the year. The statute in express terms makes it the duty of the commission to entertain such proceedings *at any time*. Administrative officers cannot divest themselves of statutory duties by refusal to act or by adjournment of their sessions, and where they attempt to do so they may be compelled by mandamus to act, even though their action may not be thereby controlled. 34 Am. Jur., Mandamus, §§ 126, 127. By entertaining these proceedings notwithstanding its prior order, the commission but performed its statutory duty. There is no estoppel in such a case to prevent official action. See, Muehring v. School Dist. 224 Minn. 432, 28 N. W. (2d) 655.

Our function on appeal does not involve a consideration of the broad questions whether increases in rates of fare should be granted, but is limited to the questions which have been presented for our decision and which we have answered. No error has been shown. There should be an affirmance.

Affirmed.