Hart, J.
The city asserts that alleged needs of the company for increased rates to cover cost of increased wages, to provide proper maintenance of its plant and property, to cover operating expenses and taxes, and to provide funds to meet interest requirements and dividends on its preferred stock and reasonable dividends on its common stock do not constitute an emergency within the purview of Section 614-32, General Code, and that the motion to dismiss the application of the company for temporary increase of rates should have been sustained.
Section 614-32 reads as follows:
“The commission shall have power, when deemed by it necessary to prevent injury to the business or interests of the public or any public utility of this state in case of any emergency to be judged by the *91 commission, to temporarily alter, amend, or with the consent of the public utility concerned suspend any existing rates, schedules or order relating to or affecting any public utility or part of any public utility in this state. Such rates so made by the commission shall apply to one or more of the public utilities in this state or to any portion thereof as may be directed by the commission * *
It will be noted that, under the statute, the determination of an emergency rests within the sound discretion of the commission; that one emergency objective is “to prevent injury to the business or interests of * * * any public utility of this state”; and that an emergency is “to be judged [or determined] by the commission.”
It appears from the finding and order of the commission that when the company filed its original application for increased rates on July 23,1951, the commission advised it that the application could not be processed for several months due to the fact that several other large companies had filed for rate increases prior to the date applicant had filed. This fact furnished one of the constituent grounds for the “emergency” as found by the commission and was one of the motivating influences which caused the company to apply for temporary increase of rates. See Section 614-20, General Code.
The city, in its brief, argues that “here we have a company which seeks to avoid complying with Section 614-20 and other sections of the General Code pertaining to public utility rate-making and obtain rate increases, as an emergency matter, by claiming that additional revenues are needed for purposes which in the normal course of business easily could have been anticipated," all of which must mean, in the view of the city, that the company should have applied for and *92 obtained rate increases at an earlier date under the provisions of Section 614-20, General Code. This argument is not persuasive and suggests that the city has suffered no prejudice by the emergency order. The court does not regard the emergency order of the commission as unreasonable or unlawful. See City of Cincinnati v. Public Utilities Commission, 149 Ohio St., 570, 574, 80 N. E. (2d), 150; City of Akron v. Public Utilities Commission, 126 Ohio St., 333, 336, 185 N. E., 415; City of Cincinnati v. Public Utilities Commission, 96 Ohio St., 270, 274, 117 N. E., 381.
The city claims also that a necessity for increased revenues furnishes no basis for an emergency order increasing rates, and that the commission’s order in that respect was not supported by the facts or by the law. There was undisputed evidence to sustain the finding that the income available for fixed charges in the sum of $165,564.40 is not sufficient to defray the cost of bond interest and dividends on the preferred stock; that the company requires additional annual revenue in the amount of $221,871 in order to meet increased operating expenses and pay its fixed charges; that the undepreciated book value of the company’s plant as of September 30, 1951, was $7,830,150.78, which was less than its reproduction cost new less depreciation; and that even with increased revenues in the amount of $221,871, the rate of return on the book value of $7,830,150.78, as of September 30, 1951 (without adding thereto an amount for material and supplies and cash working capital), would be only 2.52 per cent as the result of an increase of 11.43 per cent in the then present rates of the company.
The city, in support of its contention that inability to pay dividends does not constitute an emergency for increase of rates, cites the case of New England Telephone & Telegraph Co. v. State, 95 N. H., 58, 57 A. *93 (2d), 267. That case, however, was considered in the case of Southwestern Bell Telephone Co. v. State, 202 Okla., 291, 293, 214 P. (2d), 715, 717, in which the court said:
“The commission does not contend that under the showing made by the company in its application for temporary or emergency rates the company is receiving a fair and just return on its investment, its chief contention being that so long as it had an income sufficient to pay operating costs, fixed charges, including interest on borrowed capital with any amount over for common stock, that no emergency existed and that for that reason the company was not entitled to increased temporary rates.
“In support of this contention the commission relies upon the case of New England Telephone & Telegraph Co. v. State, 95 N. H., 58, 57 A. (2d), 267.
i i * #
“The New Hampshire court cites no authority in support of its holding, and no other authority to that effect is cited in the commission’s briefs. The holding of that court is directly contrary to the decisions of this court involving similar situations and to the decisions of the Supreme Court of the United States, where it reasonably appears that a considerable length of time will be consumed in a hearing upon an application for a permanent rate increase. Oklahoma Gas & Electric Co. v. State Corporation Commission, 83 Okla., 281, 201 P., 505; McAlester Gas & Coke Co. v. Corporation Commission, 101 Okla., 268, 224 P., 698; Prendergast v. New York Telephone Co., 262 U. S., 43, 67 L. Ed., 853.”
In the case of In re Applications of Minneapolis and St. Paul St. Ry. Cos., 228 Minn., 435, 37 N. W. (2d), 533, the court held:
“2. In fixing an emergency or temporary street rail *94 way rate of fare, the commission has the power to fix it in such an amount as will produce revenue not only necessary to meet fixed charges and operating expenses, but also sufficient to yield a reasonable return on the fair value of the property devoted to street railway use.”
Another claim of the city is that the commission committed prejudicial error in overruling the city’s motion for an order striking all references to the city of Cambridge from the application of the company for authority to make temporary emergency increases in rates and from the several exhibits offered in evidence by the company.
On cross-examination, Hirsch, a witness called by the company, testified in part as follows:
“Q. Are the facilities of the plant at Cambridge, Ohio, in such poor condition that an emergency exists which requires immediate repair or replacement of such equipment or facilities? A. The answer is no.
" * * *
“Q. Mr. Hirsch, in observing the plat [plant] facilities for the purpose of signing this report which is now known as exhibit No. 1, did you observe whether or not any of the facilities or equipment in Cambridge, Ohio, was used to render service in any — in Portsmouth for instance? A. Certainly not.
“Q. You mean the facilities in Cambridge are not used to utilize [render] service in Portsmouth, Ohio? A. That is correct.”
On cross-examination, Dunlap, an officer of the company, testified as follows:
“Q. Mr. Dunlap, in filing the application for increase in interim rates in connection with the Cambridge exchange, did you take into consideration the net operating income in Cambridge, Ohio? A. The net operating income of the Cambridge exchange, *95 whatever it was, was included in the net operating income of the company as a whole.
“Q. It was not applied to the operating expenses in Cambridge to determine the net operating income in Cambridge alone? A. No determination of net operating income by exchange was made.
“Q. Do you know what percentage of earnings are now being had by the company with respect to its Cambridge property alone? A. I do not.
“Q. You do not, and that was not considered in connection with the filing of the application for an interim increase? A. The net operating income of the Cambridge exchange as a separate entity was not considered separately in determining the requirements for interim relief purposes.”
The city claims that, in view of the testimony of these witnesses, telephone subscribers of the company in Cambridge are being required, through the order of the commission, to pay emergency increases in rates for telephone service under the provisions of Section 614-32, General Code, although no emergency is claimed to exist in Cambridge.
It is urged that Section 614-32, General Code, giving the commission power “to temporarily alter, amend, or * * * suspend any existing rates, schedules or order relating to or affecting any public utility or part of any public utility in this state,” gives the commission power to fix emergency rates only at points where the emergency exists.
The city suggests that the question here raised, so far as it relates to a telephone company, has not been passed upon by this court, although the court has held that a municipality is the unit for rate-making purposes as to companies furnishing electric lighting and gas service. See Hardin-Wyandot Lighting Co. v. Public Utilities Commission, 118 Ohio St., 592, 162 *96 N. E., 262; Columbus Gas & Fuel Co. v. Public Utilities Commission, 127 Ohio St., 109, 187 N. E., 7.
The commission contends that the city, by its motion to strike all references to the city of Cambridge from the application of the company, sought to limit telephone rate-making to an exchange basis rather than to a company-wide or state-wide basis; that there are no statutory provisions requiring telephone rates to be so fixed; that the prior effective rates of the company were established on a state-wide basis; that the issue of exchange basis versus state-wide basis for fixing telephone rates was then before the.commission and argued by the present protestants; and that their contention was rejected.
The powers and privileges granted by the General Assembly to telephone and telegraph companies are set forth in Section 9170 et seq., General Code. A telephone company is not required to secure a franchise from a municipality in order to occupy its streets with poles, wires and other equipment and to operate thereon. The only power a municipality may exercise over a telephone company operating therein is to regulate the manner in which the poles, wires and equipment shall be placed in the city streets. The manner of use of the streets of a municipality is a matter of agreement between the municipality and the telephone company. If the company and the municipality cannot agree as to the use of the streets of the latter, provisions are made for the Probate Court of the county to direct the manner in which the company may use the public streets so as not to inconvenience the public. See Section 9178, General Code.
On the other hand, municipalities have exclusive control over the rights and privileges of electric, gas and water companies.
Section 9193, General Code, provides in part:
*97 “In order to subject such companies to municipal control alone, no person or company shall place, string, construct or maintain a line, wire, fixture or appliance of any kind to conduct electricity for lighting, heating or power purposes through a street, alley, lane, square, place or land of a city or village without the consent of such municipality.” See, also, Sections 9195, 9320 and 9322, General Code.
Electric, gas and water companies must obtain a municipal franchise to operate in any municipality, whereas the right of a telephone company to operate comes from the state and does not require a franchise from any municipality. Hardin-Wyandot Lighting Co. v. Village of Upper Sandusky, 93 Ohio St., 428, 439, 113 N. E., 402. Municipalities not only have complete control in granting franchises to electric, gas and water companies but have the power to regulate the rates charged by such companies. See Sections 614-44 and 3982, General Code. No such power of regulation is given to municipalities over the rates of a telephone company. This seems to be public policy adopted generally by the states for very practical reasons. The South Dakota Public Utilities Commission, in In Re Northwestern Bell Telephone Co., 66 P. U. R. (N. S.), 140, 148, said:
“In order that the telephone service of the state be most serviceable to the public in the light of modern requirements and habits, it is necessary that there be adequate, efficient telephone development in all communities, large and small, and throughout the rural areas. Rates for telephone service therefore should be fixed and regulated so as to encourage the maximum development throughout the state both as to telephone exchanges and the long distance lines interconnecting them. ’ ’
*98 Of course, in fixing company-wide rates, the commission must fix rates in each locality that are just and reasonable according to the circumstances. Sections 614-13 and 614-23, General Code. See Puget Sound Trac. L. & P. Co. v. Reynolds et al., Public Service Comm., 244 U. S., 574, 61 L. Ed., 1325, 37 S. Ct., 705, 5 A. L. R., 13; Board of Supervisors of Arlington County v. Commonwealth, ex rel., 186 Va., 963, 45 S. E. (2d), 145; New York Telephone Co. v. Prendergast, 36 F. (2d), 54; Michigan Bell Telephone Co. v. Odell, 45 F. (2d), 180. In view of the law as we find it, this court must reject such contention of the city.
The order of the commission is affirmed.

Order affirmed.

Weygandt, C. J., Middleton, Taft, Matthias, Zimmerman and Stewart, JJ., concur.