City of Jacksonville, et al., Appellant, vs. William M. Ledwith, Appellee.

1. A market, within the meaning of that provision of the Jacksonville municipality act, chapter 3775, statutes of 1887, authorizing the mayor and city council to establish and regulate markets, is a place to which the public may resort for selling and buying certain articles; and where the articles are exposed for sale in stalls or space provided for such purpose, and for the

use of which stalls or space toll may be charged; and for whose government reasonable regulations, having in view the preservation of peace and good order and the health of the community, may be prescribed.

2. In the United States the authority to establish and regulate markets falls within the police power of the States; and the right to exercise such authority may be conferred by a State upon municipal corporations, and it is competent for these corporations, if the authority delegated is sufficient, to prohibit the sale of such articles as are within the exercise of the police power and usually sold at markets, elsewhere than at a duly established market.

3. The question whether or not a grant to a municipal corporation of power to establish and regulate markets implies authority to prohibit the sale of articles falling within the power and vendable at a market, elsewhere than at a duly established market, not decided, but referred to, and authorities cited.

4. A grant to a municipal corporation of power to regulate by ordinance the vending of meat, poultry, fish, fruits and vegetables, gives authority to prescribe by ordinance the times and places of their sale, and to prohibit the sale of them elsewhere. The restrictions as to such times and places must, however, be reasonable, with reference to the welfare of the community, and not be in general restraint of trade. Under this grant, sales may be restricted, under the same limitations, to markets duly established under a grant of power to establish and regulate markets.

5. The authority of a municipal government to establish and regulate markets implies power to purchase or provide a site, erect necessary buildings and stalls, and, when they are provided either by a lease, purchase or other lawful mode, to adopt reasonable regulations for the government of the market and the business transacted there.

6. Where a municipal corporation constructs or rents a building, its principal object being to provide a market house, an appropriation of a portion of the building for another purpose, as the holding of municipal courts, does not render the erection or renting of the building illegal.

7. If reasonable facilities for selling at markets are given, regulations, restricting to markets the sale of articles falling within the police power or the sale of which the health or welfare of the community requires to be regulated, do not constitute a prohibition or illegal restraint of trade, or a monopoly.

8. The courts are the final judges as to what are proper subjects of the police power, and the law-making power cannot arbitrarily make that a subject of its exercise which, from its nature, is not one.

9. Where the language of a statute authorizing an exercise of the police power is so broad as to include things which are not, as well as those which are subjects of the power, the exercise of the power will be confined to things which are legally the subjects of that power.

10. Where the statute establishing a municipal government provides that its legislative power shall be exercised by a city council, and that no bill shall become a law until it shall be signed by the mayor, unless he shall fail to return it, with his objections, to the council within a prescribed time, or unless it, on being so returned, shall be passed by two-thirds of the whole number of the council, and also provides that the mayor and council shall have power to establish and regulate markets by ordinance, and to regulate the vending of meats and other specified articles in like manner, a market cannot be established, nor can it or the vending of such articles be regulated otherwise than by municipal law, enacted in the manner above indicated; and an ordinance attempting to authorize the city council or a board of health, or both, to exercise either of the above powers independently, and in disregard of the above provision for the co-ordinate action of the mayor, conveys no authority in the premises. The authority cannot be delegated.

11. The word "privileges," as used in the act establishing the municipality of Jacksonville, where power is given to levy and collect taxes, for the purpose of revenue, upon "all property and privileges taxable by law for State purposes," and to license, tax and regulate auctioneers, retailers of liquors, and other named avocations, "and all other privileges taxable by the State," does not mean such things as are technically privi-

leges and can never be enjoyed or exercised except under authority of law, but means other occupations of the same kind as those designated. A market being a franchise, or technical privilege, is not taxable by the city of Jacksonville for revenue purposes.

12. The municipality of Jacksonville is not given the power which the State has of selecting the subjects of occupational taxes for raising revenue; but is limited to the occupations named in its charter act or the revenue laws of the State.

13. The first section of Article XII, chapter 3775, of the statutes, as amended by the eleventh section of the act of May 31st, 1889, does not in its provision, "privileges may be licensed and taxed by city ordinances," designate subjects of taxation. The purpose of the section is to regulate the manner of assessing and levying taxes on real and personal property and taxing avocations elsewhere subjected to municipal taxation.

14. Wherever the power to authorize or license a person to establish a market exists in a municipal corporation, a fee for the permit, or license, may be charged by the municipality as a police regulation, although the power to exact a tax for revenue may not exist. A sufficient fee may be charged under the police power to cover not only the necessary expense of issuing the license, but also that of the additional labor of officers and other expenses imposed upon the public by the business, but no more.

15. A license to a person to sell meats or other thing named in the grant to the municipality of Jacksonville of power to regulate the vending of meats, etc., is not the grant of a right to maintain a market within the meaning of the legislative grant of authority to establish and regulate markets.

16. The grant of authority to regulate the sale of meats, etc., by ordinance, is one of police power. Under it the hours, the places, and rules for conducting the business may be prescribed, and the establishment of fixed places of sale may be prohibited in localities from which their exclusion is dictated by sanitary considerations, and, as in the case of markets affording reasonable facilities for all who may desire to engage in vending such articles, the sales may be confined to particu-

lar places; yet all this must be done by impartial and general regulations, affording the same rights to all alike upon the same conditions.

17. The grant of authority to regulate the vending of meats, etc., does not give power to tax for purposes of revenue, the occupation of vending any of the named articles, but it, in connection with the grant of power to regulate inspection, justifies the imposition of such fees and charges as will cover the expense of both inspecting the articles offered for sale and of the police supervision of the business necessary to prevent its becoming harmful to the community.

18. The power to establish markets cannot be used to create a monopoly of the right to sell.

19. The police power cannot be parted with or impaired by contract.

20. The power of a municipal government to establish markets, implies the authority to change their location as the convenience of the community may dictate.

21. Where an ordinance amending a section of a former ordinance provides that such section "shall read as follows," stating the provisions, the section as amended becomes, for all future purposes, the entire section, and anything which was in the original section but is omitted from it as amended, is repealed.

22. Where an ordinance is passed establishing a public market, and providing that no person shall sell or offer for sale at any other place within the city limits, unless he shall be expressly authorized so to do by the city council, and another ordinance providing for the establishment of so-called private markets at which the same articles may be sold, is passed on the same day but approved by the mayor on a day subsequent to his approval of the other one, the two ordinances are to be considered as one ordinance for the purpose of ascertaining the intention of the municipal law-makers.

23. Where parts of an ordinance, or of two ordinances which are in pari meteria, are so connected together or dependent upon each other that it cannot be presumed the municipal law-making power would have ordained the one without the other, and one or some more of the parts are void because in conflict with provisions of the charter act, all the parts so connected

or dependent will be held invalid; e. g., where a public mar-
ket ordinance provided that no person should sell certain
articles elsewhere than at the public market, "unless such
person should be allowed to do so by the city council," mean-
ing by these quoted words unless he should be authorized to
do so under the provisions of a private market ordinance,
which latter ordinance was void on account of its conflict with
the charter act, the prohibitory clause of the public market
ordinance falls within the private market ordinance.

Appeal from the Circuit Court for Duval County.

The facts of the case are stated in the opinion.

*J. M. Barrs, Fletcher & Wurtz,* for Appellants.

APPELLANTS' BRIEF—STATEMENT OF FACTS.

On January 7, 1876, the appellee made a contract with
the city of Jacksonville, by which a market building, which
he erected in pursuance of the contract, was leased to the
city for a period of two years, the rents from the stalls to
be equally divided between the parties, and the city to have
the care and control of the market and under subsequent
renewals of this lease the city was to bear the expense of a
clerk to collect the rents, and all the costs of keeping the
building in proper sanitary condition out of its half of the
revenue. (Record 126 to 144.) The lease was renewed
from time to time until it finally expired April 1, 1889,
when the city authorities took steps to locate the public
market elsewhere, under different arrangements and condi-
tions, such as they conceived to be advantageous to
the citizens, with more agreeable and respectable surround-
ings. This new market was to be constructed on the new-
est and most approved plan, with superior facilities.

The Board of Public Works advertised for bids looking
to this end. The offer which seemed best to meet the re-

quirements of the city—in fact, the only offer at all eligible —was that of M. M. Shoemaker and others, who offered to erect a building, such as was desired, on a lot adjoining the City Post Office, where it would be within one hundred feet of street car communication, and where all the surroundings would be decorous. This site was in the block east of the block containing the Ledwith market. The city was to pay for this building the annual rental of $2,000 for ten years. The building was constructed and was accepted as in full compliance with the contract. The city took possession and proceeded to rent the stalls by the month for terms not exceeding one year, auctioning off the choice of location to the highest bidder. The City Council then passed two ordinances: first, the Public Market Ordinance (an amendment to an ordinance passed January 28, 1889), declaring said building to be the Public Market, and requiring all sales of fresh meat, etc., to be made there; and second; the Private Market Ordinance, which provided for the establishment and maintainance of private markets at such other places in the city as the Council might determine. These ordinances were both passed July 30, 1889. In violation of these ordinances and amendments to the latter ordinance, the appellee and eighteen of his tenants continued to maintain the old Ledwith market and to sell fresh meats from its numerous stalls. The Mayor sought to enforce the ordinance by arrest of the tenants of the appellee, who filed his bill herein to enjoin the city officials from interfering with him or his tenants. The answer of the appellants sets out their authority and rights in the premises and their duty, and declares the necessity for limiting the number of private markets, and the unfitness of the Ledwith building as a public market. The appellee secured a temporary injunction without notice, and this ap-

peal is taken from the order refusing to dissolve the injunction. The questions raised and submitted are:

1. Has the city, under its charter, the power to make and enforce the ordinances in question?

2. If this power is only implied or embraced in the general grant, was the power reasonably exercised?

3. Is the appellee in a position to question the validity of such portions of the ordinances as do not affect him—*e. g.*, the provision for a license fee?

### MUNICIPAL POWERS GENERALLY.

A municipal corporation can exercise the following powers and no others: first, those granted in *express words;* second, those *necessarily implied in or incident to* the powers necessarily granted; third, powers exercisable for corporate objects and purposes not simply convenient, but indispensable.

> 1 Dillon Mun. Cor. 87 (3d Ed.)
> Robinson vs. Mayor, 34 Am. Dec. 627, note P.

The powers of the city of Jacksonville are ample, embracing every possible phase of this question. The charter powers of the city are probably as full and complete as the legislature could give.

"The legislative power of said corporation shall be exercised by a City Council." Chap. 3775, sec. 3, Laws. The Council " shall have power to enforce such rules as may be adopted by the Board for its government." Chap. 3952, Art. 3, Sec. 1. " The Mayor and City Council shall, within the limitations of this act, have power by ordinances to * * * * make regulations to prevent the introduction of contagious diseases in the city; * * to make regulations to secure the general health of the inhabitants and to prevent

and remove nuisances; * * * and for the erection of all buildings necessary for the use of the city; * * * * to regulate the vending of meat, poultry, fish, fruits and vege= tables, * * * * and to establish and regulate markets, * * * * to pass all ordinances necessary for the health, con= venience and safety of the citizens, and to carry out the full intent and meaning of this act, and to accomplish the object of this incorporation, * * * * and to impose fines, for- feitures, penalties and terms of imprisonment for a breach of any City Ordinance." Chap. 3775, Art, 3, sec. 4. "Said city may lease or purchase land for public use whenever it is deemed expedient for the public good." Chap. 3953, Sec. 10. Privileges may be licensed and taxed by city or- dinance. Ib., sec. 2, and Chap. 3775, Art. 3, Sec. 1. As to the manner of passing ordinances, their force and effect, and the duties of the Mayor thereunder, see Chap. 3775, Art. 3, Sec. 2, and Art. 2, Sec. 2.

The Public Market Ordinance of July 30, amending the ordinance of January 28, 1889, provided in effect that no fresh beef, pork or mutton shall be sold at any other place than the Public Market, at the foot of Market street, with- out the express permission of the City Council (Record 151 to 160.) And the Private Market Ordinance, passed on the same day, provided that, "Private markets may be estab- lished, regulated and abolished at the discretion of the City Council; but no private market for the sale of fresh meats, fish, or vegetables shall be maintained within the limits of the city of Jacksonville except by and with the permission of the Mayor and City Council, granted by ordinance." These market places were further required to be con- structed according to the rules of the Board of Health, and there was further provision for the payment of a license fee of $5.00 for each stall. This ordinance was amended Au-

gust 30 by omitting the word "vegetables" therefrom and substituting in the last line the word "resolution" in lieu "of ordinance." This section was further amended on September 6, by adding the words, "and not more than one stall shall be permitted·or licensed within the same building." (Record 161 to 165.)

### NATURE OF MARKET—POLICE POWER.

"Markets are places where comestibles, perishable in their nature, are sold for the daily consumption of the people, which, from the very nature of the things there sold, require sanitary regulation, and thus fall within the police power of cities." "The right to establish markets is a branch of the sovereign power, and the right of regulating them is necessarily a power of municipal police." The City of New Orleans vs. Morris, 3 Woods C. C. 107. In this case, also, the Court quotes with approval the following language from Morris vs. Mayor, 2 La., 217: "The City Council has the power to establish markets and to provide for the cleanliness and salubrity of the city. In establishing markets, they designate certain spots or places for the sale of certain articles of provisions."

### POWER TO ESTABLISH AND REGULATE MARKETS.

Where an act of the legislature provided that there should not be any private market kept within twelve squares of a public market in the City of New Orleans, *held*, "not unconstitutional, either as taking away the property of those keeping private markets at the time of the passage of the act within the prescribed limits, or as taking away the vested rights of those holding licenses to keep such markets." Markets may be closed from considerations of public security and benefit. The number of markets may

JANUARY TERM, 1890. 173

City of Jacksonville v. William M. Ledwith—Argument of Counsel.

be reduced as a sanitary regulation. Lessors and lessees of markets, in such cases, must yield their private benefit and advantage to the public advantage. It is within the discretion of the lawmaker when to exercise this power, and persons embark in such occupations subject to the disadvantages which may result from a legal exercise of the power to affect them. City of New Orleans vs. Stafford, 21 Am. Rep. 563. See 16 Am. Dec. 189.

Under a charter empowering a city to "regulate the erection, use and continuance of market houses," the city may prohibit the sale of beef in market hours, except at the authorized market house. *Ex Parte* Canto, 57 Am. Rep., 609. See Commonwealth vs. Patch, 97 Mass. 221.

The City of Newbern, N. C., was authorized by its charter to "appoint market places and regulate the same." *Held*, that it had the power to build and repair a market place. "The corporation is vested with discretion as to the manner and mode of exercising its powers. They may exercise all the powers within the fair intent and purpose of their creation which are reasonably necessary to give effect to power expressly granted, and in doing this they are not confined to any one mode of operation." Smith vs. City of Newbern, 16 Am. Rep. 766. In this case grants of power are cited and construed.

In Massachusetts cities and towns, by virtue of their *general powers*, have authority to build a market house, to appropriate money therefor, and to assess the same upon the inhabitants. The same building may be used for city offices. The corporation itself is the proper judge of the fitness of the building for its objects, if the accomplishment of the object was within the corporate powers of the town. Spaulding vs. City of Lowell, 23 Pick., 71.

"The States, under their police power, may delegate to

municipal corporations the authority to establish, or authorize the establishment of markets; and it is competent to such corporations, under proper grants of power, to enact ordinances forbidding sales and purchases of marketable articles, except at designated market places." 1 Dillon Mun. Cor., Sec. 380, and note 4.

"Incorporated cities and towns have the power to build market places without an express grant. And such buildings may be used in part for something else." 1 Dillon Mun. Cor., Sec. 381, note 2. Power to "establish and regulate markets" authorizes the purchase of ground and the erection of such building as the Council may determine. Ib., sec. 382. "Every municipal corporation which has the power to make ordinances to promote general welfare and preserve the peace of a town or city may fix the time or *places of holding public markets*, and make such other regulation concerning them as may conduce to the public interest. The right to establish a market includes the right to abandon it, or shift it to another place, when the public convenience demands it, and of this the Council is the judge." Ib., Sec. 384, and notes 2 and 3, and Sec. 385 and notes. The right to "regulate" markets established by a city under its charter is one of municipal police. Ib., Sections 389, 635.

### EFFECT OF THE REGULATING POWER.

The legislature of New York passed "An Act to vest certain powers in the Freeholders and Inhabitants of the Village of Poughkeepsie," which declared that "it shall be lawful for the trustees of said village, or the major part of them, and their successors, to make, ordain, and publish such prudential by-laws, rules and regulations, as they, from time to time, shall deem meet and proper, and such in particular as are relative to public markets within the said

village, and relative to streets, and relative to anything whatsoever that may concern the public and good government of the said village." In pursuance of this provision of the charter a by-law was passed prohibiting the sale of fresh meats except at the public market house, and the Court *held* "that the trustees of the village have power to make a by-law to prevent the sale of meat, etc., for the consumption of the inhabitants within certain prescribed limits, except at the public market place." The Court say further: "The mere regulation of the building and of the stalls of those who might go there instead of elsewhere to sell their market provisions, would be an idle and useless power and of no moment toward the good government of the village." The fixing the place and times at which market shall be kept and held open and the prohibition to sell at other places and time is among the most ordinary regulations of a city or town police, and would naturally be included in the general power to pass laws relative to the public markets." Bush vs. Seabury, 8 Johns., 418.

By the charter of the village of Buffalo, the trustees were authorized to "make such prudential by-laws as they may deem proper, relative to the public markets, etc., and anything relative to the good improvement of the village, provided they were not inconsistent with the State or United States laws." *Held*, that "a by-law that meat shall not be sold except at a particular place is good, not being a restraint of the right to sell meat, but a regulation of that right." Village of Buffalo vs. Webster, 10 Wend., 99.

POLICE CONTROL OF EMPLOYMENTS IN RESPECT OF LOCALITY.

"Not only has the legislature exercised the power of confining the prosecution of certain trades to certain localities but it has very often, particularly in respect to the vending

of fresh meat and vegetables, prohibited the plying of the trade in any other place than the market established and regulated by the government." This regulation is very common in all parts of this country and has frequently been the source of litigation, but it has generally been held to be reasonable. Tiedeman's Limitation of Police Power, page 314 and note, and pages 323, 324.

Mr. Tiedeman quotes from the Slaughter House cases and notes that the decision of the Supreme Court of the United States is being generally followed.

Police powers may be exercised in the regulation of markets, and when particular articles are allowed to be sold in particular places, or after license. Cooley on Const. Limit., 595, 596 (4th Ed.) " The power is continuing, and markets once established may be changed at the option of the authorities, and they cannot, even by contract, deprive themselves of this power." Ib., 596, note 4, and authorities. " License to make use of property in certain modes may be revoked by the State, notwithstanding they may be connected with grants based on consideration, and it is intimated that the police power of the State could not be aliened even by express grant." Ib., 283, and notes 1 and 2.

A municipality should occupy the same ground.

The right to regulate and dispose of ships in the East and North Rivers in New York City, and the right to impose penalties for the disobedience of such orders, " extends to wharves in the hands of private owners and is not unconstitutional as interfering with private property, or impairing the obligation of contracts. It is valid as a police regulation." Vanderbilt vs. Adams, 7 Cowan, 349.

It will be observed that there is no discrimination between *persons* in the Private Market Ordinance. No person is allowed greater rights than another. The language of the

JANUARY TERM, 1890.                    177

City of Jacksonville v. William M. Ledwith—Argument of Counsel.

ordinance expresses the clear intention of the makers that the discretion and judgment of the Council are to be directed to the *place* and not to the person. " Private markets may be established, regulated," etc., "but no private market for the sale of fresh meats, fish or vegetables, shall be maintained except by the permission of the City Council."

### DELEGATION OF POWER TO THE BOARD OF HEALTH.

But it is sought to attack the ordinance on the ground that the powers of the City Council are thereby delegated to the Board of Health (Sec. 2.) By this section the Board of Health has only to prescribe the sanitary rules and specifications by which these markets are to be constructed and governed. If these rules are not complied with, so essential in our climate in the matter of handling fresh meats, and the petition for a market does not bear, when it reaches the Council, the endorsement of the Board that such rules have been observed, the Council, under the ordinance, will not permit a market to be located. If these rules, which are intended to protect the public health, and which are reasonable in every respect, (see Record, 188 to 196,) are complied with, and the petition is so endorsed by the Board, the Council may grant the permit, or, in the public interest, it might refuse to grant the permit upon grounds appearing *dehors* the petition. The Board of Health acts in this capacity as a committee from the Council. They are supposed to understand what sanitary precautions the public health demands, and to frame such regulations as will insure the taking of these precautions. They make personal examination of proposed markets and report to the Council for its action. The power of the Board is confined to an examination into and report upon the sanitary condition of the market applied for (Record, 166 to 170.) This was

recognized by the appellee in his petitions to the Council, set out in the bill and answer.

A by-law " that no butcher or other person shall cut up or expose for sale any fresh meat in any part of the city, except in the shops and stalls of the public markets, or at such places as the standing committee on Public Markets may appoint," was held good.   1 Dillon Mun. Cor., page 390, note.

### THE LICENSE IS NOT A TAX.

But it is contended that the ordinance is void because it levies a license tax on those engaged in the occupation of selling meat in the private markets.   The Court will observe, however, that the appellee does not bring this suit on that ground.   His construction is that the Public Market *must* be in his building.   We contend that a license fee, such as is here exacted, is not a *tax* but a fee, justified as a police regulation, and is reasonable and legal.

A license fee charged by a municipal corporation for the privilege of engaging in certain occupations, for instance, that of keeping a market, is not a tax; and such a requirement is valid, not in restraint of trade, neither unreasonable nor unlawful, but is in the nature of a police regulation.

> *Ex Parte* Gregory, 54 Am. Rep., 516.
> *Ex Parte* Conto, 57 Am. Rep., 609.
> Ash vs. People, 11 Mich., 347.
> 1 Dillon, Mun. Cor., Sec. 387 and note.
> See 34 Am. Dec., 637 and 638, note P.

Where there are express grants, courts will not determine the unreasonableness of an ordinance.   1 Dillon, Mun. Cor., Sec. 328, note 1.

But if we admit that there is no specific grant of power to require this license, is it reasonable as a regulation?

It appears by the answer that five dollars a month from each private market stall will not more than meet the expense of necessary surveillance and inspection by the city. These markets ought to be visited from once to three times daily, and, located as they are, in different parts of a city with a river front of nine miles and extending back about two miles, it will require the services of a man whose whole time will be consumed in the work of looking after them. It is hardly possible for more than fifteen private markets to maintain themselves in the city, in addition to the public market, for any great while, and this would produce in license fees about seventy-five dollars a month—just about the salary of an inspector.

"The amount of a license is not confined to the expense of issuing it; but a reasonable compensation may be charged for the additional expense of municipal supervision over the particular business or vocation at the place where it is licensed." The ordinance is presumed to be reasonable. Van Hook vs. City of Selma, 45 Am. Rep., 85. See, also, 45 Am. Dec., 593.

Again, the right to hold a market is a franchise. Rapalje and Lawrence's Law Dictionary. 1 Dillon, Mun. Cor., Sec. 380, note 4.

The use of a market is therefore a permissive one, and it may be reasonably argued that the business of keeping a market is a *privilege* within the meaning of the charter which provides for taxing and licensing privileges. And if the charge be considered a tax, this would take it out of the provisions of the general revenue law which provides that cities can collect only fifty per cent. of the State license tax, which, in the case of butchers, is $10 a year. Nor is the particular provision of the charter repealed by the general revenue act of 1889. Luke vs. State, 5 Fla., 185. But if

this section of the ordinance be held invalid, it does not fol-
low that the whole ordinance is void or that any other por-
tion is void. The remainder of the ordinance may stand
separate and distinct from the license provision. "When
an ordinance consists of distinct and independent parts, al-
though one or more may be void, the rest are equally valid
as though the void clauses had been omitted."

> Shelton vs. Mayor of Mobile, 68 Am. Dec., 143.
> *Ex Parte* Byrd, 5 Am. St. Rep., 328.
> 1 Dillon, Mun. Cor., Sec. 421.

### THE VESTED RIGHT THEORY.

But it is further contended that the appellee has vested
rights which constitute him and his tenants a class pecu-
liarly privileged to violate the market ordinances of the
city.

The vested right theory is based on the resolution
adopted by the Council, September 3, 1889, in response to
a petition from the appellee which prayed that he "be per-
mitted to carry on business as usual in said building, and to
sell such fresh meat therein, *until the City Board of Health
and your honorable body shall have acted definitely on your
petitioner's said application.*" (Record, 173 to 176). The
effect of this resolution was to grant the petition so far as
the Council was concerned, without changing or abrogating
the ordinance then in force. The mayor could regard it or
not; but he had thereby the request of the Council to sus-
pend the enforcement of the ordinance as to the petitioner.
An ordinance is a much more solemn form of legislation
than a resolution. We contend that it is not competent to
abrogate, suspend, or change an ordinance by resolution.

While the Private Market Ordinance (Sept. 3) authorized
the granting of a permit by resolution, it also provided in

JANUARY TERM, 1890.          181

City of Jacksonville v. William M. Ledwith—Argument of Counsel.

Section 2 that no permit should be granted until the application had been "endorsed" by the Board of Health.

A resolution is an order of the Council of a special temporary character ; an ordinance prescribes a permanent rule of action or government.   It is a more solemn form of legislation.   1 Dillon, Mun. Cor., Sec. 357.

The appellee's second petition was before the Board of Health at this time, his first having been previously returned "not approved" by the Board, so that a permit thereon was denied by the Council.

Again, the rules of the Council provide that any motion may be reconsidered at the same or next regular meeting. The motion on this resolution was reconsidered at the same adjourned meeting of September 6.   This was perfectly regular.   (Record, 94, 95).   Further than this, by action of the Council (Sept. 3) a committee was appointed, looking to definite action on this matter, and required to report on September 6.   (Record, 184, 185.)

This was notice to the appellee that he proceeded with any expenditures at his peril.   The resolution last referred to was in effect notice to everyone that on September 6 the number and location of private markets (including Ledwith's) would be determined.   And on September 6 the committee reported recommending that all private markets of more than one stall be discontinued, and that the Council limit their number.   (Record. 185, 186.)

Thereupon the resolution granting the appellee's petition was reconsidered and tabled, and the Private Market Ordinance was then amended by adding to Section 1 the words, "and not more than one stall shall be permitted or licensed within the same building." (Record, 56–8.)

The Council could not estop itself from taking this action. The appellees had no vested rights under this resolution

even supposing it to be competent to suspend an ordinance by resolution. The permission, if any, was merely temporary, an "act of grace," and was binding, if at all, only so long as it remained unrevoked.

> Bradley vs. McActee, 3 Am. Rep., 309.
> Cooley, Const. Limit., 596, note 4.
> Kidd vs. Pearson, 128 U. S., 1.
> Fell vs. State, 20 Am. Rep., 83.
> Brimmer vs. City of Boston, 120 Mass., 19.
> Calder vs. Kirby, 5 Gray, 597.

The City of New York conveyed lands for the purposes of a church and cemetery with a covenant for quiet enjoyment; and afterwards, pursuant to a power granted by the legislature, passed a by-law prohibiting the use of these lands as a cemetery; and it was *held* that this was not a breach of the covenant entitling to damages, but that it was a repeal of the covenant. A corporation cannot by contract abridge its legislative powers. Brick Church vs. Mayor, 5 Cowan, 538. Nor was the city estopped by the resolution of September 3. Cobbs vs. Mayor, 7 Cowan, 585.

The charter of the City of Tallahassee gave the power to " regulate " certain business pursuits. The Court held that it conferred upon the authorities of the corporation the power to enact an ordinance conferring on the intendent the power to revoke a license once granted for the purpose of enforcing municipal regulations for the preservation of law and order. Such an ordinance is not invalid. The Court will not interfere with the municipal regulations of a city unless it can be clearly shown that it has transcended its powers or viotated its functions. Towns vs. Tallahassee, 11 Fla., 130.

*Ex Parte* Byrd, 5 Am. St. Rep., 328, presented this case: Byrd was convicted of selling meat at his store, having paid

regularly his license for that business up to May 2, 1888, in violation of an ordinance which went into effect May 1, 1888, providing for the establishment and regulation of markets at several points in the city of Mobile and prohibiting the sale of fresh meats at retail, outside of these markets, except by the tenants of the market stalls, who were permitted to hawk about the streets, "after 8 o'clock A. M." Byrd sold sound meat between seven and eight o'clock A. M. Monday, May 1, 1888. Upon *habeas corpus*, the validity of the ordinance as to him was sustained. (See note in this case.)

By a reference to Shelton vs. Mayor, 68 Am. Dec. 143, the Court will see that the city of Mobile did not have such a broad grant as has the city of Jacksonville.

*Act of Council could only be impeached for fraud. Genererally their motions cannot be enquired into.*

> 1 Dillon, Mun. Cor., Sec. 311, 313.
> Cooley, Const. Limit., 186, 187.
> 124 Mass., 486.

*Special grant of power is in addition to general grant.* 1 Dillon, Mun. Cor., Sec. 316.

### CONCLUDING REMARKS.

The charge of taking away property borders on the amusing, when it appears that the appellee's original outlay in constructing his building was about five thousand dollars and that he has since expended very little in repairs or improvements—all the expense of sweeping and caring for the building having devolved on the city; while the net receipts to the appellee have averaged three thousand dollars a year for eleven years, or since the erection of this building. (Record, 123 to 125 and 243 to 248.) If it was

ever justifiable, under any circumstances, to oblige private interest to yield to the public good, this case presents such an instance.

To compel the citizens to do their marketing in the appellee's building, in the face of the disadvantages set forth in the answer, outside of the sanitary objections to the premises (Record 180), because, forsooth, the appellee would otherwise be deprived of a large revenue from the rental of his building and adjacent property, would fasten on the city authorities a want of consideration for the public welfare which should condemn them in the estimation of all right-thinking people.

It is argued that if the new market possesses so many advantages over the Ledwith market, the tenants of the appellee would abandon the latter and occupy the former. Any business man can appreciate the objection on the part of the tenants to such a move; for, if the appellee were to gain his suit other butchers would occupy their former stalls and reap the benefit of their good will. It appears, also, that the butchers in the Ledwith market control all the imported meat, which is the meat principally consumed. The grant of power to "establish and regulate" markets presupposes that markets will not properly regulate themselves. The power is given to enable the authorities to oblige the people to do that which is sanitary and best for themselves.

To sustain this injunction means that the appellee may continue the use of his building as a market, free from any direction by the city. No sanitary inspector or health officer or policeman can set foot on these hallowed premises. The appellee will have gained the extraordinary right to make use of his property just as he may choose, and with absolute disregard of the public welfare. Under his

City of Jacksonville v. William M. Ledwith—Argument of Counsel.

supreme control his premises may become a nuisance and a seething pest-hole. The Court will hardly take away all the discretion of the council in a matter of this kind; destroy the police power of the city; destroy its control of sanitary measures; tie the hands of its constituted authorities, and rob them of the ample powers granted by the legislature. The affidavit of Dr. Maxwell (Record, 229,) shows the existence of a dump-hole in the middle of the floor of this market through which the sweepings and refuse are thrown into the river, there to float under the bulkheads of the river front and to poison the atmosphere. The dumping of this filth into the river directly violates every rule of health obtaining in the city. The affidavit of Acosta, Burbridge, Dancy, Tyler and Gruber (Record, 237 to 246,) refer to a time when the city had direct charge of this place as its public market. The city employed its own market clerk and sweep, whose duty it was to keep the place clean. Since April, 1889, the property has passed absolutely into the hands of the owner, the appellee, and the city cannot now, as then, exercise the same supervision and control over it. A new, better, cleaner, and more healthful building, with improved appointments, has been prepared and established as the public market, and for sanitary reasons private markets of more than one stall have been forbidden.

It is not incumbent on the city to establish its market in the middle of its territory. For obvious reasons this is not always advisable. In this light, the affidavits of L'Engle, Walker, Hopkins, Solary, Finch, Baya, Huau, and Stockton, (Record, 246 to 260,) have no relevancy. No doubt many persons, living in the western portion of the city, would place the middle point west of market street. Those owning property in Fairfield, East Jacksonville, Campbell's Addition, Oakland, and the old city east of Market street,

are doubtless desirous of having the middle point placed further east. In any event, the new market is but a square and a half east of the appellee's building, which he asserts is so admirably located. (Record, 160). The butchers, the tenants of the appellee, are not parties to this suit, yet they are made to do battle from page 276 to page 313 of this Record, and if their affidavits show anything they prove that a monopoly exists among them, such that people are obliged to buy of them at their prices, or fail to obtain the best in the market; that is, Western and Northern meats. The best cannot be obtained elsewhere, and yet they boast of this "forestalling and regrating of provisions" as a reason why the appellee should prevail in this suit.

The case is respectfully submitted by the appellants.

We cite, as sustaining the authorities above, the following from Horr & Bemis on Municipal Police Ordinances: Amount of license, under police powers, should cover cost of regulation. Secs. 259 and 260.

Limiting sale of fresh meats to the public market places is not in restraint of trade. Sec. 134.

General grant of power of caring for the health of the community includes the power to regulate the conduct and continuance of all trades, employments and business which tend to pollute the air or the earth. Sec. 214.

The power to establish markets implies, of necessity, the power to restrict the sale of certain articles of food to the locality provided. Sec. 217.

*Cooper & Cooper* for Appellee.

RANEY, C. J.: The act of May 31st, 1887, Chapter 3775, establishing the Municipality of Jacksonville, provides, in Section 4 of Article III, that the Mayor and City Council "shall have power by ordinance * * to make regulations to

City of Jacksonville v. William M. Ledwith—Opinion of Court.

secure the general health of the inhabitants and to prevent and remove nuisances; * * to provide for and regulate the inspection of beef, pork, flour, meal and other provisions, oils, whisky and other spirits in barrels, hogsheads and other vessels; to regulate the inspection of milk, butter, lard and other provisions; to regulate the vending of meat, poultry, fish, fruits and vegetables; to restrain and punish the forestalling and regrating of provisions, and to establish and regulate markets; * * and to pass all ordinances necessary for the health, convenience and safety of the citizens, and to carry out the full intent and meaning of this act, and to accomplish the object of this incorporation."

The substance of the market ordinances of Jacksonville, as they stood on September 10th, 1889, the time the bill in this case was filed, is, omitting the penal provisions as to a violation of the same, as follows: The Public Market ordinance makes every day except Sunday a public market day, and constitutes the market buildings on Water Lot 24, at the foot of Market street, and "not elsewhere," the Public Market; and ordains that stalls, tables, or space in this market shall be rented to butchers or others desiring to hire the same by the month, or such longer period as may be desirable, upon such terms, and for such sum as the Board of Public Works shall determine. It also provides that no person shall sell any fresh beef, fresh pork or mutton, or establish or maintain any market, stall or shop for the keeping or sale of fresh beef, pork or mutton at any place within the corporate limits, except at the public market, unless such person or persons shall be expressly authorized to do so by the City Council; provided, however, that producers bringing vegetables, poultry, eggs or other country produce to the city for sale shall be permitted to sell the same free of tax anywhere within the city.

The Private Market ordinance provides that private markets may be established, regulated and abolished at the discretion of the City Council, but no private market for the sale of fresh meats or fish shall be maintained within the city except with the permission of the City Council granted by resolution, and not more than one stall shall be permitted or licensed within the same building. Private markets must be constructed and maintained in accordance with specifications, rules and regulations approved by the City Board of Health governing the same and prescribing the size and character of stalls, and no permit for the establishment or maintenance of any private market shall be granted except upon a petition endorsed by the City Board of Health. No person can maintain or do business in a private market except upon paying to the City Treasurer for a license, the sum of five dollars per month for each and every stall used, and no person shall do the business contemplated by this ordinance except upon stalls licensed as heretofore provided.

A market, says Blackstone, is a franchise or liberty derived from the crown by grant, or by prescription which supposes a grant. 2 Com., 37 ; the establishment of public marts or places of buying and selling, such as markets and fairs, with the tolls thereunto belonging being in England within the King's prerogative as to domestic commerce ; 1 Com., 274 ; such prerogative consisting in the discretionary power of acting for the public good where the positive laws are silent, and if it be abused by him to the public detriment, such prerogative is exerted in an unconstitutional manner. Ibid, 252. In Jacob's Law Dictionary, as well as that of Tomlin, a market is defined to be the liberty by grant or prescription, whereby a town is enabled to set up and open shops, &c., at a certain place therein for buy-

ing and selling, and better provision of such victuals as the subject wanteth ; it being less than a fair and usually kept once or twice a week.   Bouvier's definition is :   A public place and appointed time for buying and selling, a public place appointed by public authority where all sorts of things necessary for the subsistence or for the convenience of life are sold.   In Ketchum vs. the City of Buffalo, 21 Barbour, 296, it is said, citing Crabb's Law of Real Property, that a market is the privilege within a town to have a market, and the franchise may be granted to natural persons or bodies politic; the grantee of the franchise has the right to have the market, but the public have also an interest in the market, and the grantee of the franchise is bound to provide suitable accommodations for those who attend the market.   Judge Dillon, in his work on Municipal Corporations, note 4 to Section 380, quotes the definition given by Judge Breeze, which is :   A designated place in a town or city to which all persons can repair who wish to buy or sell articles there exposed for sale.   See also Cincinnati vs. Buckingham, 10 Ohio, 257 ; State vs. City of Newbern, 70 N. C., 12; City of Burlington vs. Dankworth, 73 Iowa, 170.   The public character of markets is further illustrated by Prince vs. Lewis, 5 B. & C., 363, where the grantee of the market for the buying and selling of vegetables, fruits, flowers, roots and herbs, had for his own profit permitted part of the space to be used for other purposes than those specified in the grant, and the residue of the space became insufficient for public accommodation, and there was not on ordinary occasions space within the market for carts and wagons resorting thither with vegetables, *et cetera*, and it was held that the owner of the market could not maintain an action against an individual for selling vegetables in the neighborhood of the market and thereby de-

priving him of toll, even at a time when there was room in the market, without showing that on the day when the sale took place he gave notice to the seller that there was room within the market. Again, in Moseley vs. Walker, 7 B. & C., 55, it is said by Bayley, J.: I take it to be implied in the terms in which a market is granted that the grantee if he confine it to particular parts within a town, shall fix it at such parts as will from time to time yield to the public reasonable accommodations; and that if the space once alloted ceases to give reasonable accommodation, he is bound if he has land of his own to appropriate land on which to hold it; or if not, to get land from other people, in order that the market which was originally granted for the benefit of the people, as well as for the benefit of the grantee, may be effectually held, and that the public may have the benefit which was originally intended they should derive from it.

In the case of Mayor of Penryn vs. Best, 3 Law Reports, Exchequer Division, 292, decided in 1878, the Court said: "The mere grant of a market does not of itself confer the right to prevent persons from selling on market days in their private houses, though within the town or manor where the market may be held. This was decided in the case of Mayor of Macclesfield vs. Chapman, 12 M. &. W., 18. It is pointed out in the judgment that an old case, the Prior of Dunstable's case, 11 H. 6, f. 19 a, and cited in City of London's Case, 8 Rep., 127, a, had been erroneously supposed to decide the contrary. It may also be considered as decided by the case of Earl of Egremont vs. Saul, 6 Ad. & E., 924. We feel bound by these authorities, although *dicta* may no doubt be found to the contrary. See Mosley vs. Chadwick in note to Mosley vs. Walker, 7 B. & C., 47. The second conclusion by which we are bound is

that such a right as is contended for may be acquired by immemorial enjoyment or prescription.   Mosley vs. Walker, 7 B. & C., 47, Mayor of Macclesfield vs. Pedley, 4 B. & Ad, 397." In the Court of Appeal, this view of the law was affirmed though the judgment of tre lower court was reversed on the ground that the right to prevent butchers from selling at their private shops on market days within the limits of the franchise was shown by the evidence to exist by prescription.   3 Law Reports. Exchequer Division, pp. 292, 297 *et seq.*

In our own country the authority to establish and regulate markets falls within the police power of the States, and the right to exercise such authority may be conferred by a State upon municipal corporations; and it is competent for these corporations, where the delegation of power is sufficient, to prohibit the sale of marketable articles outside of the regularly established markets.   Dillon on Municipal Corporations, Sections 141, 380; City of Bowling Green vs. Carson, 10 Bush, 64; First Municipality vs. Cutting, 4 La. Ann., 335; *Ex-parte* Byrd, 84 Ala., 17 : S. C. 5. Am. Rep., 328.

The question, whether or not the grant of the power to "establish and regulate markets" implies, when standing alone, authority to prohibit elsewhere than at duly established markets, the sale of articles falling within the exercise of the police power, need not be decided in this case, although it would seem that authorities of great respectability sustain the affirmance of it, and some of them holding that such is the current of authority.   Bush vs, Seabury, 8 Johnson, 418; Village of Buffalo vs. Webster, 10 Wend, 100; Cronin vs. People, 82 N. Y., 318. *Ex-parte* Canto, 21 Texas Ct. App., 61; S. C. 57 Am. Rep., 609; *Ex-parte* Byrd, 84 Ala., 17, Morano vs. Mayor, 2 La., 217;

City of Bowling Green vs. Carson, 10 Bush, 64; Winns-boro vs. Smoot, 11 Rich., (Law), 551; Dillon on Municipal Corporations, Sec. 380; Ash vs. People, 11 Mich., 347; St. Louis vs. Webber, 44. Mo. 547. There are, however, authorities to the contrary. Bethune vs. Hughes, 28 Ga., 560; Coldwell vs. Alton, 33 Ill., 416. See also City of Bloomington vs. Wahl, 46 Ill., 489; City of St. Paul vs. Landon, 2 Minn., 190. In addition to the grant of author-ity to "establish and regulate markets," the legislature has, as appears in the first paragraph of this opinion, expressly authorized the Mayor and Council to "regulate the vending of meat, poultry, fish, fruit and vegetables," and under this grant we are satisfied that they may by ordinance prescribe the time and places for the sale of the articles it covers ; and such restrictions as to times and places being reasonable with reference to the welfare of the community, and not being in general restraint of trade, they may likewise pro-hibit the sale of such articles elsewhere. That the sale of them may under this grant be restricted to markets duly established under the other, where the regulations do not constitute an illegal restraint or a prohibition of the trade, we do not doubt. Tiedeman's Limitations of Police Power, Section 104 ; City of St. Paul vs. Træger, 25 Minn. 248, 255, and authorities cited *supra*.

Authority to establish and regulate markets implies, be-yond question, the power to purchase or provide the site and erect necessary buildings and stalls, and, when pro-vided by lease, purchase or other lawful mode, to adopt reasonable and usual rules and regulations in regard to the market and the business transacted there, and having in view the preservation of peace and good order, and the health of the community; Dillon, Section 382 ; Ketch-um vs. Buffalo, 14 N. Y., 356 ; Smith vs. Newbern, 79

JANUARY TERM, 1890.    193

City of Jacksonville v. William M. Ledwith—Opinion of Court.

N. C., 14; Gale vs. Kalamazoo, 23 Mich., 344; Spauld-
ing vs. Lowell, 23 Pick., 71, and Coldwell vs. Alton,
*supra*. If the real and principal object is the building
of a market house the appropriation of a portion of the
building to other purposes, as for the holding of courts, does
not render the erection of the building illegal; Spaulding
vs. Lowell, 23 Pick., 71 ; and the same rule will hold good
where, as in the case before us, the premises are leased.
Gale vs. Kalamazoo, 23 Mich., 344. An express grant of
police power as to regulating the vending of meat, poultry,
fish, fruits and vegetables, as has been given to the city
of Jacksonville, supplements the other with the restrictive
authority as to the time and place at which any article within
its meaning and purpose shall be sold. There is nothing in
the act which excludes markets as the places to which the
vending shall be restricted.

Where reasonable facilities for sale at markets are given,
such a regulation is not a prohibition of trade, nor the cre-
ation of a monopoly, the subject-matter of the regulation
being, as in the case of fresh meat and fresh fish, one which
the health or welfare of the community requires, should be
regulated. It is argued by counsel for appellee that the
language of the act includes the power to regulate the
vending of all kinds of cured meat as well as of fresh meat,
and if power is given to prohibit the latter it is also as to
the former, and hence it was not intended to give this power
as to either. We do not admit that there is "prohibition"
of the sale of fresh meats in the fact that an ordinance re-
stricts its sale to market houses, still, it is a sufficient answer
to the argument made, to say that if the language of the
statute is broad enough to cover any kind of meat, the
vending of which cannot reasonably be dangerous to the
health or welfare of the people, such language will be con-

fined, when considered as authorizing the exercise of the police power, to the proper subjects of that power. It is well settled that the courts are the final judges as to what are proper subjects of its exercise, and the legislature cannot arbitrarily make that a subject which from its nature is not so. *In re* Jacobs, 98 N. Y., 98; Mugler vs. Kansas, 123 U. S. 623. It would be unreasonable to hold that the use of language so broad when considered in the abstract as to cover things not the subject of the police power, shows a legislative intent not to authorize the exercise of the power as to proper subjects of it. Moreover, the provisions of the same section as to preventing nuisances, and regulating or licensing, or prohibiting and suppressing theatrical and other exhibitions, and prohibiting and suppressing gambling houses and other things, certainly do not limit the meaning and effect of a grant of the power to regulate the vending of meat or to establish and regulate markets.

The general law for the incorporation of cities and towns, as amended in 1877, Section 22, p. 250, McClellan's Digest, enacts expressly that the city or town council shall have power to establish market houses, and to require each and every person who may have for sale any fresh meat or fresh fish, to bring the same into the market and offer the same for sale only in the market; and in view of the absence of such an express provision from the charter act under consideration, it is contended that a legislative intention to withhold from the municipality of Jacksonville the authority to restrict such sales to market places is manifested. No particular formula of words, or expression is essential to convey a power. The only question is, does the language used in any special or general act clearly confer the power? As stated above, our opinion is that

both upon principle and authority the grant is unquestionably sufficient to do so in this case.

It is necessary to a judgment upon the validity of the above ordinances to inquire how the power to establish markets, or to regulate the same, or the vending of meats or other articles mentioned, can be exercised. The statute says: The Mayor and City Council shall "have power by ordinance" to do so. Section 4 of Article III, Chapter 3775, page 164, Acts of 1887. The first section of the same article enacted that "the legislative power of said incorporation shall be exercised by a City Council," and this provision is retained in the section, as amended by an act approved May 16th, 1889, Chapter 3952, Acts 1889. The second section of the article of the act of 1887, provides that no bill shall become a law "until it shall have been signed by the Mayor, except that it may be passed without his signature as herein provided. No ordinance, or portion of an ordinance, vetoed by the Mayor, shall go into effect unless the same be passed by two-thirds of the whole number of members of the City Council. If the Mayor fail to return any ordinance at or before the next regular meeting after its passage, he shall be deemed to have approved the same, and it shall become a law without further action." Page 164, Acts of 1887. The second section of the same article of this act, p. 162, is to the effect that the Mayor shall carefully examine all bills passed, and should any not meet his approbation, he shall return the same to the next regular meeting of the Council with his objections in writing, and he may veto objectionable features, and "approve" the residue of the bill. From these provisions it is plain that a market cannot be established, nor can regulations thereof or of the vending of meats, poultry, fish, fruits or vegetables be made, except by munic-

196        SUPREME COURT.

City of Jacksonville v. William M. Ledwith—Opinion of Court.

ipal law  duly passed  by the Council  and  afterwards  sub-
mitted to the Mayor and sanctioned by his approval attested
by his  signature,  or  which he  has failed to return  to the
next regular  meeting of  the Council after its  passage, or
which, having been returned  to the Council with his objec-
tions, has been passed  over his veto  by two-thirds  of the
whole number of the Council.

It is to be observed that by the Public Market ordinance
as given above, no person can sell any fresh beef, fresh pork
or mutton, or establish any market, stall, or shop for keep-
ing or selling the same, or either of them, within the corpo-
rate limits of the city, except at the public market, unless
such person shall be  expressly  authorized  to do so by the
*City Council.*   This provision appears in the ordinance as it
was when adopted in January, 1889, and  was not changed
by the amendment made by the  Council  and  approved  by
the Mayor July 30th, of the same year.   The Private Mar-
ket ordinance passed  by the Council July 30th, but not
approved by the Mayor until August 5th, provided in its
first section that private markets might be established, regu-
lated and abolished at the discretion of the City Council, but
that no private market for  the sale of fresh meats, fish or
vegetables should  be maintained *except by and with the per-
mission of the Mayor and City Council granted by ordinance;*
but an ordinance was passed and approved the thirtieth
day of August providing that this section should read as
follows :  " Private Markets may be  established, regulated
and abolished at the  discretion of the City Council, but no
private market for the sale of fresh meats or fish shall be
maintained within the limits of  the City of Jacksonville
except with the permission of the City Council granted by
resolution."   The provision that not more  than one stall
should be licensed or permitted in the same building, was

added by the amendment passed September 6th, and approved the next day. The fifth section of the Private Market ordinance, approved August 5th, repeals an ordinance of June 6th, 1888, regulating and governing private markets, but it is not shown, nor is it material to know, what its provisions were. We may, however, remark that it does appear there was in the contract made between appellee and the city, in 1876, as to the Public Market established at the foot of Ocean street, on Water Lot Number Ten, and continued, with renewals and modifications, immaterial to mention, down to May 1st, 1889, an express stipulation that all other markets then existing in the city should be abolished, and that be the sole and exclusive market, excepting such markets as might be legally existing under contract with the city.

We do not think it can be doubted that the purpose of the amendment of August 30th was to make the right to keep a private market for the sale of fresh meats, *et cetera*, dependent upon the permission of simply the Council expressed by resolution, instead of the permission of the law-making power duly expressed according to the forms prescribed by the charter act for making municipal law ; and considering the ordinance as thus amended, and also as it stood after the subsequent amendment approved September 7th, its meaning was that the City Council as a separate body might establish, regulate and abolish at its discretion, private markets without its action being subjected to the co-ordinate action of the Mayor or having gone through the course required by the statute to make it municipal law. It is too plain to admit of discussion that this cannot be done. *Ex-parte* Frazee, 63 Mich., 396; S. C. 6 Am. St. Rep., 310; Dillon on Municipal Corporations, Secs. 96, 357, 716, 779; Cooley's Constitutional Limitations, 249; not

that legislative action in the form of a resolution and which has been passed by the Council, submitted to the Mayor and received his approval, or not been returned by him, or having been duly returned by him, has received the two-thirds vote, may not be an ordinance, (Dillon on Municipal Corporations, Sections 307 and 769 and notes; Robinson vs. Mayor of Franklin, 34 Am. Dec., note p. 633) but for the reason that markets. cannot be established, nor can regulations for them, or for the vending of meat and other articles specified in the provision of the statute, be made by the Council as an independent part of the city government, or in any other manner than by proper ordinance duly enacted as the statute has provided. Horn vs. People, 26 Mich, 221, and Ruggles vs. Collier, and other authorities cited with it *infra.*

The amendatory section of August 30th took the place of and entirely superseded the first section as it was in the original ordinance of August 5th, and the consequence resulting from the omission of the italicised words and the insertion of those proposing to delegate to the Council the power to establish and regulate markets is, that there was from the approval of the amendment no valid provision for the establishment or regulation of private markets. Advisory opinion, 15 Fla., 735; Basnett vs. Jacksonville, 19 Fla., 664; State *ex rel.* McQuaid vs. Commissioners of Duval County, 23 Fla., 483; Saunders vs. Provisional Municipality, 24 Florida, 226. That which was in the old section, but was left out of the new, ceased to exist as a part of the municipal law because it was actually and, we must hold, intentionally omitted, and the invalidity of the substituted subject-matter in the new section proposing to give to the Council a power which it can not legally exercise, does not change the fact that the itali-icised provision of the original section is no longer a part

of the municipal law. The omitted matter is no longer in existence as a part of the section, or to be construed by the courts.

Another part of this private market ordinance to be noticed is its second section, which provides: That such market must be constructed and maintained in accordance with specifications, rules and regulations approved by the City Board of Health governing the same, and prescribing the size and character of stalls, and no permit for the establishment or maintenance of any market shall be granted except upon a petition endorsed by the City Board of Health.

It appears that on the sixth day of August, or the day after the approval of the private market ordinance, the Board of Health formulated and prescribed rules for the govern ment of private markets. They prescribe, *inter alia*, that such a market shall have a water-tight floor of yellow pine heart plank, or portland cement, or of both, as in the judgment of the Board may be deemed necessary, at least one inch in thickness on a solid foundation, the grade of the floor; connections with the sewers and with the water works; that the construction of all markets shall be subject to the supervision and approval of the City Engineer and Health Officer, and the market to the daily inspection of an officer of the Health Department; the size of the stalls (not less than three feet wide and six feet long) and that they shall be covered with a marble slab, white oil cloth or other "acceptable" substance, and furnished with "suitable" meat block and with galvanized iron hooks; the hour at which the markets shall be closed, and the removal of meats afterwards; the washing of the stalls, floors, *et cetera*, and the use of disinfectants that may be prescribed by the Board; and how meat shall be moved from one market to another, or transferred through the streets. The fifth of these rules is,

That persons owning and operating private markets and wishing to continue the same, and those desiring to establish and maintain them, must immediately present to the Health Officer or to the Chairman of the Board, for the action of the Board, a petition to the City Council; that it shall state the location, number of stalls, full specifications of the construction, size and other details of the proposed market or building, together with an assurance that the applicant will, in case his application is approved by the Board and granted by the City Council, promptly comply with ordinances of the city and the rules of the Board, adopted or that may be adopted, in relation to the payment of license, and the fulfillment of sanitary requirements and restrictions in the construction and operation of private markets.

These rules appear from an endorsement of the Recorder to have been submitted to and adopted by the City Council in regular session on the day they were formulated by the Board.

They are intended to control the establishment of, and to regulate markets. The establishment and regulation of markets must be effected by ordinance enacted or ordained in the manner prescribed by the statute. It cannot be done either by a Board of Health acting, in the language of the brief of appellant's counsel, "in the capacity of a committee from the Council," nor by the Council itself, nor by both. The Board of Health in prescribing these rules has done no more than the second section of the ordinance contemplated, and the attempted exercise of this authority by the Board was as much unauthorized as the effort of the ordinance to delegate the power was illegal. A public duty which the Legislature has confided to the deliberative judgment or discretion of the law-making power of a municipality can-

not be delegated by the latter to the judgment or discretion of one constituent element of that power, nor to the judgment or discretion of others. To permit it to be done would be to defeat the will of the Legislature as to whose judgment or discretion should direct the subject-matter of the duty confided. Ruggles vs. Collier, 43 Mo., 359; St. Louis vs. Clemens, 43 Mo., 395; Sheehan vs. Gleeson, 46 Mo., 100; Mattox vs. Alexandria, 68 Mo., 115; White vs. Mayor, 2 Swan (Tenn.), 364; Day vs. Green, 4 Cushing, 433; State vs. Bell, 34 O.; St., 194; Lord vs. Oconto, 47 Wis., 386; Birdsall vs. Clark, 73 N. Y., 73; Hitchcock vs. Galveston, 96 U. S., 344; Indianapolis vs. Indianapolis Gas-Light & Coke Co., 66 Ind., 396.

The special market ordinance is alledged to be void because it also prescribes illegal prerequisites, and one of the prerequisites objected to is the license and the charge of five dollars per month for each and every stall.

Section 4 of Article III of the charter act, Chapter 3775, authorizes the Mayor and Council "to levy and collect taxes upon all property and privileges taxable by law for State purposes; * * * * to license, tax, and regulate auctioneers, taverns, peddlers and retailers of liquors, and all other privileges taxable by the State; to license, tax, and regulate hackney carriages, carts, omnibuses, wagons and drays, and to regulate and license the sale of fire-arms; * * and to regulate, tax, license or suppress the keeping and going at large of all animals within the city." The eleventh section of the act of May 31st, 1889, Chapter 3958, an act supplementary to Chapter 3775, amends Section one of Article XII of the parent act, retaining, however, the provision, "Privileges may be licensed and taxed by city ordinances," and also enacting that the Council may provide for licensing the keeping of dogs.

At the session of the Legislature of 1887, at which the charter act, Chapter 3775, was passed, a general revenue law, Chapter 3681, was enacted, it having received the approval of the Governor, June, 13th, 1887, or thirteen days. after the charter act was approved. This act imposes what was styled "license taxes" on different occupations and professions, and provides that no person shall engage in or manage the business, profession or occupation mentioned therein unless a State license shall be procured in the manner prescribed, and enacts that counties, incorporated cities and towns, may impose such further taxes of the same kind upon the same subjects as they may deem proper, but that they shall not impose any such tax on any business, profession or occupation not mentioned therein, nor shall the tax imposed by them exceed fifty *per cent.* of the State tax. The same limitation upon counties, cities and towns, is to be found in former general revenue laws, as it also is in the amendatory revenue law of May 28th, 1889, Chapter 3847. The revenue law of 1887, Chapter 3681, imposes a license tax on auctioneers, "taverns" (or what may be deemed the same thing, keepers of hotels and boarding houses); peddlers and retailers in spirituous, vinous or malt liquors, but not on hackney coaches, carts, omnibuses, wagons or drays, and all of this is true of the act of 1889; and in each of these general revenue statutes there is to be found a proviso that the license tax provision as to peddlers with boat or horse and cart or carriage shall not extend to boats and carts engaged in the sale of vegetables and plantation products, fish and oysters. The question, assuming the five dollar fee to be a tax for revenue, is: Does the special act authorize the imposition of such a license or occupational tax upon the franchise or business of a market. Counsel for appellants suggests that the right to maintain a

market being a franchise, it is a privilege, and is therefore taxable. Admitting, as we do, that the right to keep a market and charge toll is a franchise, and consequently a privilege, within the meaning of Stevens vs. State, 2 Ark., 291 ; S. C. 35 Am. Dec., 72 ; Washington vs. State, 13 Ark., 752, still this admission is not conclusive in favor of the right of the city under the above provisions of its charter act to impose a revenue tax upon such markets or persons keeping them, for the meaning of the word "privileges" in the charter act is unmistakable from the connection in which it is used. When the act gives power to levy and collect taxes upon all property 'and privileges taxable by law for State purposes, and to license, tax and regulate auctioneers, taverns, peddlers and retailers of liquors and all other privileges taxable by the State, it is clear that the Legislature did not use the word, privilege, to designate such things as are technically privileges, and cannot ever be enjoyed or exercised in England except through the prerogative of the Crown or under act of Parliament, or in this country by authority of law, but to denote other occupations and business of the same kind as those mentioned and that are taxable by law for State purposes. In a word, we think the meaning of the Legislature as shown by the language last referred to, was simply that whatever occupations were subjected to taxation by the State laws, might be taxed by the City of Jacksonville under an ordinance or ordinances duly passed, and none other ; and this view is strengthened by the fact of the subsequent provisions of the municipal law as to hackney carriages, carts, omnibuses, wagons and drays which were not subjected to "license taxes" by the act of 1887, or that of 1889, and hence the necessity for the special mention of them in the charter act. Moreover, this provision as to hackney carriages, etc.,

would not have been inserted had it been the intention of the Legislature to delegate to the Mayor and Council by the preceeding provision the same power which the State has of selecting the subject of occupational or license taxes, Section 5, Article IX, Constitution, instead of limiting it to the subjects named in the charter act and the revenue laws of the State. Markets are then not subject as occupations to taxation for revenue under the charter act.

There was nothing in the provision of Section one of Article XII of the act of 1887 as to "privileges," nor is there anything in the amendment of it made in 1889, that qualifies the above conclusion. That section, as it appears in the act of 1889, Chapter 3953, reads, omitting the provision as to licensing dogs, as follows: "All property which is subject to State taxes shall be assessed and licensed for taxation alphabetically for the entire city without reference to wards. The assessment shall be made by the Comptroller and his assistants, and the valuation of real and personal property shall be subject to be increased or diminished by the Council under regulations to be made by ordinance. Privileges may be licensed and taxed by city ordinances * * * . All the duties now devolved upon the Recorder in reference to the levy and assessment of taxes, shall devolve upon and be performed by the Comptroller." It is evident that the purpose of the section is, not to designate the subject of taxation, but to regulate the manner of assessing and levying taxes on real and personal property and of licensing and taxing the avocations declared elsewhere to be taxable and designated here as those by the word "privileges." It prescribes the manner and mode of exercising the taxing power against the previously defined subjects of taxation.

Appellants do not admit, however, that the charge of five

dollars is a tax levied for the purpose of raising revenue, but contend that it is a fee properly chargeable as incident to the power of police regulation, and as such is authorized. According to this private market ordinance no person can "maintain or do business in a private market," except upon paying to the City Treasurer, for a license, the sum of five dollars per month for each stall; and no person can do business in any such stall or private market that is not so licensed. We have seen that by this ordinance not more than one stall can be licensed in the same building. Prior to an amendment of it approved September 7th, 1889, there was no such limitation upon the number of stalls in one building. Assuming that under the power granted to the Mayor and Council, they may by ordinance authorize the establishment of public markets by private individuals, the same being controlled and regulated by the Mayor and Council by ordinance according to the principles of the decisions in Davenport vs. Kelly, 7 Iowa, 102 (notwithstanding LeClain vs. Davenport, 13 Iowa, 210), Dillon on Municipal Corporations, Section 385, and note 4; Gale vs. Kalamazoo, 23 Mich., 344; Indianapolis vs. Indianapolis Gaslight & Coal Co., 66 Ind., 396; Slaughterhouse Cases, 16 Wall., 36; Butchers' Union vs. Crescent City Co., 111 U. S., 746; Villarasso vs. Barthet, 39 La. Ann., 247, our opinion is that the power to do so includes, as a market is a franchise, the power to license; a permit to establish a market is from the nature of a market, a license; it is a permit to do something which could not be done before without such permit, and hence is the grant of a license. Besides this, as we have stated in the earlier part of this opinion, the power to establish markets is within the police power, and all this being true, we are unable to conclude that the power to charge, as a police regulation,

a fee for the permit or license to establish and maintain a market, as distinguished from a permit or license for selling meats or vegetables therein, does not exist. It seems to us that it necessarily does. The fee, however, is not a tax for revenue, but a charge under the police power, and its amount is to be controlled by the principles governing in such cases. What amount of fee or charge can be exacted is a question upon which the authorities are in conflict. By some it is held that no more than the expense of issuing the license can be charged. Judge Cooley's view is that the right to license an employment, no power being given to also tax it for revenue, gives the corporation authority to impose such a charge for the license as will cover, not only the necessary expenses of issuing it, but also the additional labor of officers and other expenses imposed by the business, but nothing beyond this limit; and this seems to us to be the better rule. Cooley's Constitutional limitations, 244, and note 1 ; Cooley on Taxation, 408-9-10; Van Hook vs. Selms, 70 Ala., 362; S. C. 45 Am. Rep., 85 ; *Ex-parte* Anderson, 20 Texas Ct. App. 210; S. C. 54 Am. Rep., 516 ; Cincinnati Gas-Light & Coke Co. vs. State, 18 O. St., 237.

A permit or license to a person to sell meats or fish, or other things, is not the grant of a right to maintain a market, within the meaning of the legislative grant to the Municipality of Jacksonville of the power to establish and regulate markets. The establishment and regulation of a market means the right to establish and furnish certain places where the public may resort for selling and buying provisions or articles of immediate necessity, and where the owners of the articles may expose them for sale, and to regulate these places and the business done there, and includes also the right to make charges for the use of stalls

and space used by those resorting there with their products to sell the same. Markets are public conveniencies, and not a mere license or permit to a person to sell his marketable property. Though the grant of authority to regulate the vending of meat, poultry, fish, fruits and vegetables will permit the legislative power of the city to ordain general regulations, applicable to all alike, as to when and where those articles may be sold, it is not one conferring the franchise of establishing a market, but it is a power to regulate the sale of articles which, but for it, could be sold anywhere and at all times. The power to establish markets cannot be used to create a monopoly of the right to sell. It is not intended for any such purpose. The right to sell at markets must be secured to all alike on the same conditions. The grant as to vending meats, *et cetera,* is one of police power and it is to be exercised upon considerations, referable to the public health or welfare of the community, and not arbitrarily, nor to create a monopoly in one or several persons, nor to prohibit the trades to which it applies. Though under it the hours of the day, the places, and the mode or manner of and rules for conducting the business may be designated and prescribed, and the establishment of fixed places of sale may be prohibited in localities from which their exclusion is dictated by sanitary considerations, and, as in the case of markets affording reasonably ample facilities for all who may desire to engage in vending such articles, the sales may be confined to specific places, yet all this must be done on principles of impartial and general regulation affording the same rights to all alike upon the same conditions, and not in the exercise of a partial and discretionary or arbitrary will of the law-making power or of any part of it. Tiedman's Limitations of Police Power, 273, 274, 278; First Municipality vs. Blineau, 3 La. Ann.,

688; Kennedy vs. Phelps, 10 Ibid, 227; City of New Orleans vs. Stafford, 27 La. Ann., 417; Villarasso vs. Barthet, 39 La. Ann., 247; Belcher vs. Farrar, 8 Allen, 325; Cooley's Con. Lim., m. p. 201; Horne vs. People, 26 Mich., 221; Mayor vs. Radecke, 49 Md., 217; S. C. 43 Am. Rep., 239; Matter of Frazee, 63 Mich., 396; S. C. 6 Am. St. Rep., 310; Mintun vs. Lorne, 23 How, 435; Logan vs Pyne, 43 Iowa, 524; St. Johnsbury vs. Thompson, 59 Vt. 300, Clark vs. Le Cren, 9 B. & C., 52; Chamberlain vs. Compton, 7 D. & R., 597.  It does not authorize the imposition of taxes for revenue purposes upon the occupation of vending, but it dose in connection with the  grant as to inspection made in  the  same section justify such fees  and charges as may be required to cover the expense of inspecting the articles  offered for sale and of  the police supervision of the business necessary to prevent its becoming harmful to the community.   Though the right to engage in the business at the times and places and under the same conditions applicable to all cannot be denied to any, the business may be so regulated as the public welfare may demand and the courts will not interfere with the  enforcement of a regulation except  where it shall be  manifest that the protection of the public is  not its  purpose.   Austin vs.  Muncey, 16 Pick., 126; Dillon on  Munic. Corp. note 2, to Section 141; Cooley's  Con. Lim., m. p. 203.   The police power is one whose existence is essential to the protection and welfare of the public, and  while it should be used  unhesitatingly and efficiently for the ends it was intended to subserve, it should not be used for other purposes, nor further than is necessary to fully effect the legitimate end in  any particular case falling within its proper exercise.

It is plain from the record before us that the right claimed by Ledwith, the appellee, is that of  maintaining a  building

where stalls and space are provided for butchers or others desiring to sell, for the use of which stalls and space he makes charges. For some years prior to May, A. D. 1889, his premises, at the foot of Ocean street, had been the designated public market, controlled and regulated by the city, under an ordinance and a contract between the city and himself, which contract expired on the first day of that month. The expiration of this contract excludes from the case all question as to the effect which, if existing, it might have had on the right and power of the city authorities to change by ordinance the location of the public market, or, barring any other defects that may exist in the Public Market ordinance of July 30th, 1889, to establish the public market at the foot of Market street, and abolish that at the foot of Ocean street. As against the appellee, or any one whose premises or buildings had been the legally established public market, there can be no doubt of the right of the city authorities to remove the market to a different place, or to abolish an existing one and establish a new market. Neither the appellee, nor any other person, nor any corporate body other than the municipality of Jacksonville, acting through its law-making authority, has been given power by the Legislature to establish markets within the territory of that city. In Florida the Legislature alone can confer such power. The power to establish a market includes the power to change the location of it from place to place as the convenience and necessities of the community may dictate. Dillon on Mun. Corp., Section 382; Cooley's Con. Lim., 744, note 2; Wartman vs. City of Philadelphia, 33 Penn. St., 202; Gall vs. Cincinnati, 18 O. St., 563, Cougot vs. New Orleans, 16 La. Ann., 21; City of New Orleans vs. Stafford, 27 La. Ann., 417; Rex vs. Cottrell, 1 B. and A., 67; Curwen vs. Salkeld, 3 East., 538; Gale vs.

Kalamazoo, 23 Mich., 344; Villarasso vs. Barthet, 39 La. Ann., 247; Butchers' Union vs. Crescent City Co., 111 U. S., 746; Presbyterian Church vs. City of New York, 5 Cowen, 508. These authorities show how groundless the vested right theory of complaint, based on the injury to the value of his property through decrease of rental, is, and how firmly set is the rule that the police power can not be parted with, or impaired, by contract or barter.

The second section of the Public Market ordinance shows by the words "unless such person or persons shall be expressly authorized so to do by the City Council," particularly when they are considered in connection with the Private Market ordinance, that it was not the intention of that ordinance to prohibit the sale of fresh meats, etc., elsewhere than the so-called public market. On the same day, July 30th, 1889, that the first section of this ordinance was so amended as to establish the public market at the foot of Market street, the so-called Private Market ordinance was passed, although the latter did not receive the sanction of the Mayor till the 5th day of August, and it is this Private Market ordinance that was intended by the law-making power of Jacksonville to furnish the rule under which the express authority suggested by the second section of the Public Market ordinance, might be obtained for selling, or offering for sale, fresh beef, fresh pork or mutton elsewhere than at the public market, or establishing or maintaining a market, stall or shop for the sale of the same. The two ordinances are to be considered together, or as one, in seeking for the intention of the municipal law-maker as to markets and the vending of the meats mentioned in them. Considering them together, we find that the manifest intention to permit and regulate sale elsewhere than in the locus of the public market, as well as that to permit other

markets, has not been effectually ordained; or, in other words, the ordinance governing such sales and markets is void because it purports to remit their establishment, maintenance, regulation and abolition to the sole discretion of a body—the City Council—that cannot exercise the power, and also to delegate to a committee—the City Board of Health—authority which the State Legislature has committed to the law-making power of the municipality. It is thus apparent that the City of Jacksonville, as represented in the expression of her legislative agency speaking for her, intended not only that there should be a public market at the foot of Market street, but that there might be other places established at which sales could be made, yet that sales could not be except at the public market or a so-called private market, and to make this intention effectual she has ordained that a person who violates the provision of the public market ordinance as to selling at other places than the public market or a private market should be subject to fine or imprisonment. It happens, however, that the private market ordinance is void, and the question arises as to what effect this fact has upon the validity of the above prohibitory provision of the public market ordinance. In our opinion it invalidates it because it never was the intention of the law-making power of Jacksonville that sales should be confined to the public market, and to enforce it with the effect of prohibiting sales elsewhere in the absence of valid regulations of such sales would be to do what was never intended. Whether or not an ordinance restricting sales to one place in a city of the territorial extent and of the population of Jacksonville would be held to be valid if assailed as unreasonable, it is unnecessary to decide, as such cannot be said to have been the purpose in this case.

The rule as to statutes is that part of an act may be unconstitutional without invalidating the whole of it. If all the provisions are connected in subject-matter depending upon each other, operating together for the same purpose, or otherwise so connected together in meaning that it cannot be presumed that the Legislature would have passed the one without the other, the whole act will be declared void. On the other hand, where some parts are not connected with or dependent upon others, as where a statute attempts to accomplish two or more independent objects, it may be void in part and valid as to the residue. If its purpose is to accomplish a single object only and some of its provisions are void, the whole must fail, unless sufficient remains to effect the object without the aid of the invalid portions. If the valid and the void parts "are so mutually connected with and dependent on each other as conditions, considerations or compensations for each other as to warrant the belief that the Legislature intended them as a whole, and if all could not be carried into effect, the Legislature would not pass the residue independently, then if some parts are unconstitutional, *all the provisions which are thus dependent, conditional or connected* must fall with them." Cooley's Constitutional Limitations, m. p. 177-179; State *ex rel.* Boyd vs. Deal, 24 Fla., 293. The same principles apply to city ordinances. Dillon on Municipal Corporations, Section 421 and notes. A valid charter act is the constitution of a municipality as much as the work of a regularly chosen convention ratified by the vote of the people is the organic law of the State. It is evident that the purpose of the public and private market ordinances considered together is two-fold. Outside of its prohibitory provisions the object of the former was to provide a public market where persons could resort to sell and buy as indi-

cated above. The object of the prohibitory clause was to regulate the sale of certain articles, and it cannot be denied that it and the private market ordinances are conditions, considerations and compensations for each other. Surely the specified provision of the former with the clause last quoted above would not have been ordained without enacting the private market ordinance unless it should be assumed that it was deemed necessary to have the latter ordinance to make the quoted clause effectual; and that it was not so assumed we are concluded by the fact of the enactment of the private market ordinance. This prohibitory clause of the so-called public market ordinance, and the private market ordinance are as connected with, conditional upon and compensatory to each other as if they were in the same ordinance or section of an ordinance, and the invalidity of the latter ordinance is fatal to the specified provision of the former. To hold the contrary would be to enforce what was never intended by any branch of the law-making power of Jacksonville in passing or approving either of these by-laws.

It is evident that there is no valid regulation prohibiting sales elsewhere than at the public market, and for this reason there is no legal impediment to the sale in the appellee's building, and he should, in the absence of legal restriction of sales to other places, not be interfered with in the alleged use of the premises.

It may be well for us to remark that it is not to be inferred from anything said in this opinion, that the municipal authorities may not avail themselves of all sources of knowledge and experience in framing rules and regulations, nor is the power of the city to use all usual or proper agencies for the enforcement of the same when *duly ordained* to be doubted.

We have gone as far into the questions affecting the vendors of meat doing business in Ledwith's building as is necessary to a decision of the case. Ledwith is not such a vendor, and it is not proper that we should say more than we have upon any question not affecting his rights.

The decree is affirmed.